[Crim. No. 35673. Second Dist., Div. One. Dec. 15, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
BYRON SINCLAIR COTTON, Defendant and Appellant.

## COUNSEL

Barry Allen Herzog, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Jane M. Began, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AUERBACH, J.*—Defendant was charged by information in count I with violation of Penal Code section 245, subdivision (a) (assault with a deadly weapon—an automobile); in count II with violation of Penal Code section 487, subdivision 3 (grand theft auto); in count III with a felony violation of Vehicle Code section 10851 (driving without the owner's consent); in count IV with violation of Vehicle Code section 23101 (causing bodily injury while driving a motor vehicle under the influence of intoxicating liquor); and in count V with a misdemeanor violation of Vehicle Code section 23104 (reckless driving causing injury). Count IV (felony drunk driving) was dismissed upon the granting of defendant's motion under Penal Code section 995.

Defendant waived jury trial. At the conclusion of the prosecution's case in chief, defendant's motion to dismiss pursuant to Penal Code section 1118 was granted solely as to count II (felony grand theft auto). At the conclusion of trial, the court adjudged defendant guilty of counts I, III and V.

Probation was denied and the court ordered defendant committed to the California Youth Authority for the upper term of four years for assault with a deadly weapon. California Youth Authority and county jail commitments for terms of two years and six months, respectively, were imposed on counts III and V, and ordered permanently stayed upon appellant's successful completion of the commitment on count I.

*Statement of Facts*

At approximately 2 a.m. on December 11, 1978, Officers Wingert and McCarville, of the Pasadena Police Department, were patrolling in a marked police vehicle, which was driven by Wingert. They observed a yellow 1979 Datsun 280 ZX driving on Colorado Boulevard with defendant at the wheel and one Clifford Madrid as his passenger. The Datsun had neither license plates nor temporary registration and it was thought the car might be stolen. Wingert turned his vehicle and followed the Datsun and activated his flashing emergency lights. He turned on his siren as he approached the Datsun, which accelerated away from the officer's vehicle.

---

*Assigned by the Chairperson of the Judicial Council.

A pursuit that covered about six and one-half miles followed at break-neck speed. Defendant drove the Datsun onto and off a nearby freeway and over various residential streets, reaching speeds in excess of 100 miles per hour. He ran approximately 10 red lights or flashing yellow lights while on the surface streets. Another police unit operated by Officer Uribe joined the pursuit and became the number one pursuing car when Wingert's radio malfunctioned.

As the chase continued westbound on Colorado Boulevard, defendant and his pursuers approached Sierra Madre Boulevard. About one block from the intersection, defendant's speed was about 100 miles per hour and he was driving without lights. At that time Wingert saw a police car, driven by an officer later identified as John Rose, attempt a left turn into the intersection. Defendant had been straddling the number one and number two lanes and it appeared to Wingert that the Datsun turned directly toward Rose's car. Wingert saw no brake lights on the Datsun and heard no screech of tires because of his siren. Within two seconds, the Datsun struck the left rear of Rose's car, causing it to spin clockwise and to burst into flames. Defendant and Rose each suffered injuries which required hospitalization.

Officer Rose testified he was monitoring the police broadcasts of the pursuit for five to eight minutes before he arrived at the intersection of Colorado Boulevard and Sierra Madre Boulevard. Just as he was entering the intersection on the green light at a speed of about five miles per hour, without his emergency lights on, he looked east on Colorado and saw flashing emergency lights about two-tenths of a mile away. He instantly turned on his own emergency lights. He saw no other vehicles with headlights, but decided to make a left turn to reach the safety of the center divider. Before he could reach that point, he felt the impact of a collision, saw a brilliant flash of light, staggered from the wreckage of his burning car, made his way to a position of safety and then blacked out. The collision that occurred was between the left front of the Datsun and the left rear of the police car. Measurements were taken immediately after the accident which showed the Datsun left skid marks of approximately 81 feet to the point of impact and between 180 and 208 feet after the impact.

The manager of the Culver City Datsun Company testified that the car driven by defendant was last seen on the company's lot more than 30 days before the accident and was not discovered to be missing until

the date of the accident. It had been removed without the owner's consent and defendant had no permission to drive it.

Officer Uribe, called by defendant as a witness, testified he was driving the lead pursuit car. When he was about two blocks from the point of impact, he saw Rose's car, with lights flashing, enter the intersection. He saw the Datsun swerve slightly or fishtail in both directions, as if the driver were undecided about what he might do next. He was approximately a block away when the Datsun collided with Rose's car.

Defendant testified that around midnight of December 11, 1979, he borrowed the Datsun, which he had never driven before, from a friend named Ricky Wells. He went to make some purchases and met Clifford Madrid, whom he had not previously known, in a restaurant. Madrid showed him some bags of marijuana which he offered to sell defendant. Defendant declined but agreed to give Madrid a ride to Lake Street. When he became aware of the police car behind him with flashing lights and a siren directed at him, he fled because of the marijuana on Madrid's person. He asked Madrid to dispose of the marijuana during the flight. No marijuana was found after the crash.

Defendant first saw Rose's car when he was about 50 yards away and the police vehicle turned in front of him. He tried to avoid Rose's car by moving to the other side and by hitting the brakes, but Rose's car had stopped in his path. He braked his car when he was about 80 feet away and tried to slow down as much as he could. His foot was on the brake at impact. The impact caused the brake pedal to bounce back and break his ankle.

The question as to whether the circumstances of defendant's flight from the police would support a conviction of assault with a deadly weapon was argued at two junctures in the trial. In moving for an acquittal on count I pursuant to Penal Code section 1118, defendant urged the lack of a showing of the requisite underlying intent to commit a battery with an automobile. The motion was denied, with the following statement: "THE COURT: But you have really a continuing course of conduct. That is like somebody, you know, shooting a gun, loaded gun at someone's hand, let him shoot. The intent is like a transferred intent. If you are breaking the law with regard to, let's say, a Vehicle Code Section, which is Count V, 23104, where you injure something and it falls within the definition of 245(a), I think you have got the intent

there. [¶] If he had been driving the car in a normal manner and not at a hundred miles an hour, I think you can argue there is no general intent. However, in this particular situation, I think there's sufficient intent for me to deny the 1118 as to Count I."

During the closing argument, the prosecutor took the position that defendant's driving demonstrated a conscious choice to drive his car with wanton and willful disregard of human life, which supplied the general intent to commit a battery. The prosecutor suggested that defendant might have tried to ram Officer Rose's car as a part of his escape plan.

Mr. Johnson, defendant's counsel, contended that by swerving before the impact, by applying his brakes, and by laying down over 80 feet of skid marks, the defendant demonstrated a lack of willful intent to strike the officer's car. The court engaged in the following colloquy with Mr. Johnson:

"THE COURT: Let's talk about that intent. That is a general intent crime as of Count I.

"MR. JOHNSON: Yes.

"THE COURT: We discussed it a little bit yesterday in your 1118 motion.

"For example, let's go back to what we learned in law school. You shoot a loaded gun and, let's say, you are intending to shoot that gun at a wall. It bounces off the wall and it hits somebody. That would be involuntary, let's say, manslaughter at best or an accident.

"Let's say you are shooting at someone; you miss, but you hit the person behind him. There is a question, is that voluntary manslaughter or is it done in a willful, wanton disregard of human life, which brings it up from voluntary manslaughter up to, let's say, second degree, or if I intended to specifically kill you and I missed and hit the person behind you, there is that intent that is transferred.

"Here we have the testimony, by the defendant as well as the officers, that it was corroborated testimony, that the defendant was going 110 miles an hour down Colorado Boulevard in a westbound direction. He is

breaking the law. He is responsible, because he has put himself in motion that is the unlawful intent. That, I think, is where they get the intent for assault by force likely to produce great bodily injury, the weapon being the automobile. That is what I have moot [*sic*] eyes on.

"MR. JOHNSON: Your Honor, the difference in analogy on the bullet, once you fire the bullet you can't control it. The actions are over with at this point.

"THE COURT: Don't you have the same options when you are driving at 110 miles an hour in a residential area at 2:00 o'clock in the morning on Colorado Boulevard?

"MR. JOHNSON: Your Honor, he had at least the ability to control it. I think it is the control that we are talking about, which brings into question the state of mind, that is the intent. I think if—that if, in this instant case he attempted to exercise his control over the vehicle to direct it in another direction, which he, as the officer—as Officer Uribe said, it appeared as if he did not know which way he wanted to move. I think at that point this car was coming towards him or at least on some angle toward him.

"At that point he didn't know which way to go. He chose an option. At the rate he was traveling, he couldn't—he had lost control at that point, but yet he had a foot on his brakes trying to stop it. I think the analogy of the missile at that point ceases to be appropriate in this situation because he did have control of it to a limited degree and did attempt to exercise that control, which shows he did not have the intent to intentionally strike the rear of the vehicle.

"THE COURT: To be frank with you, I could buy your argument if we were talking in the range of anywhere from zero to 40 miles an hour. When you go over 40 miles an hour, that is where I think it was done and that's where this fifth cause of action, this reckless driving causing great bodily injury, that's the intent. Basically it transfers over to this of the other general intent, assault by force likely to produce great bodily injury and with a deadly weapon. If this was specific intent I would agree with you. This is not a specific intent crime. This is a general intent crime."

I

■ Defendant contends that defendant's conviction for assault with a deadly weapon must be reversed because the court misapplied the concept of transferred intent and failed to consider the appropriate element of intent to commit a battery. We agree that a reversal is required.[1]

■ From *People* v. *Rocha* (1971) 3 Cal.3d 893, 898-899 [92 Cal.Rptr. 172, 479 P.2d 372], we distill four principles which are here germane: (1) an assault is an attempt to commit a battery; (2) assault with a deadly weapon is a general intent crime; (3) the intent necessary to commit an assault is the intent to commit a battery; and (4) mere reckless conduct alone is insufficient to constitute an assault. Whether the requisite intent existed is a question for the jury. (*People* v. *Carmen* (1951) 36 Cal.2d 768, 776 [228 P.2d 281].) It follows that the validity of defendant's contention must stand upon an analysis of his intent.

The colloquies between the court and counsel evidence that the court invoked a faulty conception of the doctrine of transferred intent in evaluating defendant's conduct to establish the existence of an intent to commit a battery on an unintended victim. As explained in *People* v. *Williams* (1980) 102 Cal.App.3d 1018, 1027-1028 [162 Cal.Rptr. 748], the fiction of transferred intent is implied in two circumstances—the "mistaken identity" situation (A intends to kill B but kills C in a mistaken belief that C is B) or the "bad aim" situation (A fires at B, misses, and hits C). In each of those situations, the actor intends to commit a battery when he initiates his conduct.

■ It is obvious from the court's statements that it did not accept a theory that defendant deliberately collided with Rose's vehicle. And wisely so, for that would have been an unsupported assessment of the evidence. The facts are that Officer Rose drove unexpectedly into the intersection when defendant was speeding at 100 miles per hour, that the accident happened within two seconds from the time Rose tried to reach the center divider, that in those seconds defendant swerved, his car fishtailed and he applied his brakes which, allowing for reaction time and based on the length of the skid marks, indicates his evasive action must have occurred almost at the very time he first observed Officer Rose's car.

---

[1]We need therefore not consider defendant's contention that his sentencing was infected with error due to the court's neglect to state its reasons for its sentencing choice.

It is obvious that the court was misled by its faulty conception of the doctrine of transferred intent and that this venture into the quagmire of legal fiction precluded a meaningful examination of the nature of defendant's intent towards Officer Rose. In considering defendant's intent, the court simply transposed an intent to drive recklessly into an intent to commit a battery. In the court's own words: "When you go over 40 miles an hour, that is where I think it was done that's where this fifth cause of action, this reckless driving causing great bodily injury, that's the intent. Basically it transfers over to this [sic] of the other general intent, assault by force likely to produce great bodily injury and with a deadly weapon."

Respondent concedes that defendant did not intend to hit anyone while trying to escape. However, relying principally on *People v. Lathus* (1973) 35 Cal.App.3d 466 [110 Cal.Rptr. 921], respondent argues that a general intent to cause injury to everyone in defendant's path can be presumed from his inherently dangerous disregard for human life and safety.

In *People v. Lathus, supra*, 35 Cal.App.3d 466, defendant was convicted of assault with a deadly weapon (Pen. Code, § 245, subd. (a)). The evidence showed that appellant fired several pistol shots from a moving vehicle at a car parked on the shoulder of the road. A person standing just outside the latter car was struck. Appellant's defense was that he had seen no one near the car and that he had no intent to shoot anyone. In affirming, the court noted that the evidence supported a finding that appellant had deliberately shot at the parked auto with actual knowledge that there were people in or near it, and so the jury could infer an intent to commit a battery.

It is in this context that the court wrote the following language (p. 470): "However, when an act inherently dangerous to others is committed with a conscious disregard of human life and safety, the act transcends recklessness, and the intent to commit the battery is presumed; the law cannot tolerate a deliberate and conscious disregard of human safety. Thus, if one deliberately employs a lethal weapon, such as a gun, with actual or presumptive knowledge that if utilized in the manner in which it is being used the infliction of serious bodily injury to another is very likely to occur, he is presumed to have intended the natural consequences of his deliberate act."

This dictum from *Lathus* is not here applicable. *Lathus* did not involve reckless driving of a vehicle, culpable conduct for which the Legislature has specifically provided a punishment. This case is further dissimilar from *Lathus*, in that the court held that a fact finder could infer that the appellant "deliberately shot at the parked automobile with actual knowledge that there were people in or near it." (35 Cal. App.3d at p. 471.) In the instant case, the court's comments, previously quoted, reflect that it made no equivalent finding, but relied on the whole course of defendant's reckless driving to supply the intent to commit a battery.

Respondent also cites *People* v. *Martinez* (1977) 75 Cal.App.3d 859 [142 Cal.Rptr. 515], a case which likewise lends no support to its position. In that case, Martinez was charged with assault with a deadly weapon on a police officer in violation of Penal Code section 245, subdivision (b). At the preliminary examination, the evidence disclosed that there was a street disturbance that four policemen tried to quell. They were pelted with beer cans and beer bottles, which narrowly missed hitting a child. Martinez, carrying a brown bottle, crouched down in a military or hand grenade stance and threw the bottle. The bottle struck an officer after bouncing off a police vehicle. There was nothing to prevent Martinez from having an unobstructed view of the officer when he let fly the bottle. On the People's appeal from the granting of a motion to dismiss by defendant under Penal Code section 995, the appellate court ruled that there was sufficient cause to hold Martinez to answer. The court held that the evidence permitted an inference of a general intent to commit an assault with a deadly weapon. In *Martinez*, as in *Lathus*, an object was launched towards an identifiable target and it could be inferred that the actor deliberately intended it to make contact with some individual in the area.

Reprehensible as may be the conduct of the defendant in this case, it constitutes no more than an example par excellance of the misdemeanor offense of reckless driving with injury, in violation of section 23104 of the Vehicle Code. In fact defendant was convicted of this charge and given a condign punishment as prescribed by the Legislature. Respondent now urges us to convert this offense into assault with a deadly weapon because of defendant's egregious conduct. It states in its brief that "all that was required was that the prosecutor show the excessive recklessness and inherent dangerousness of appellant's action for the court to find guilt as a matter of law." It justifies the court's comments by saying that "the trial judge was 'transferring' the count V reckless

driving (causing great bodily injury) plus the grossly excessive speed to the assault with a deadly weapon charge."

But the very vice and fallacy of this position is that section 23104 of the Vehicle Code bespeaks a legislative intention to make that self-same conduct a misdemeanor. Section 23103 of the Vehicle Code provides in part that "[a]ny person who drives any vehicle upon a highway in willful or *wanton disregard for the safety of persons* or property is guilty of reckless driving . . . ." (Italics added.) Section 23104 of the Vehicle Code provides for an increased penalty whenever reckless driving of a vehicle proximately causes bodily injury to any person.

An examination of the conduct that section 23104 proscribes as reckless driving will at once manifest that it conforms precisely to defendant's conduct in this case. To escalate this conduct into an assault with a deadly weapon would honor more in the breach than in the observance of *Rocha's* teaching that "mere reckless conduct alone cannot constitute an assault." (*Id.*, 3 Cal.3d at p. 898.)

In *People v. McNutt* (1940) 40 Cal.App.2d Supp. 835 [105 P.2d 657], the court construed the words "willful and wanton disregard for the safety of persons or property" in Vehicle Code section 505, a predecessor to Vehicle Code section 23104, and remarked that wanton "'includes the elements of consciousness of one's conduct, intent to do . . . the act in question, realization of the probable injury to another, and reckless disregard of the consequences.'" (*Id.* at p. 837.) The court epitomized the language of the statute as being akin to the willful misconduct standard under the former guest statute. The court stated: "'Wilful misconduct implies at least the intentional doing of something either with a knowledge that serious injury is a *probable* (as distinguished from a possible) result, or the intentional doing of an act with a wanton and reckless disregard of its *possible* result.'" (*Id.* at p. 838.) (Italics in original.) This language was approved by the Supreme Court in *People v. Young* (1942) 20 Cal.2d 832, 837 [129 P.2d 353].

A graphic illustration of what constitutes reckless driving appears in *In re Bradley* (1968) 258 Cal.App.2d 253, 258 [65 Cal.Rptr. 570]. In that case, a minor driver, playing a game which he described as "chicken," drove his vehicle at a speed of approximately 40 to 45 miles an hour directly towards a 14-year-old child. The terror-stricken child froze and could not evade the oncoming car. When the vehicle was close upon the child, the driver swerved, trying to avoid her, laying down ap-

proximately 80 feet of skid marks. The car struck the child, seriously injuring her. In upholding a conviction under section 23104 of the Vehicle Code, against a contention that the evidence was insufficient to sustain the judgment, the court stated "[u]nder these circumstances there was an abundance of evidence to support the trial court's conclusion that the minor plaintiff intentionally drove his vehicle with knowledge that serious injury to the minor victim was probable, or that he intentionally acted with a wanton and reckless disregard of the possible result of his conduct."

Our research has disclosed two reported California cases which hold that when warranted by the facts, an automobile may be used as a "deadly weapon," or an "instrument," or a "force likely to produce bodily injury" as those terms are used in Penal Code section 245, subdivision (a). Those cases are *People* v. *Claborn* (1964) 224 Cal.App.2d 38, 42 [36 Cal.Rptr. 132], and *People* v. *Finney* (1980) 110 Cal.App.3d 705 [168 Cal.Rptr. 80]. An examination of their facts is instructive.

In *Claborn*, the victim was a deputy sheriff who was on his way to apprehend defendant after receiving a battery complaint. He was driving his car in the opposite direction from defendant's vehicle and signaled with his red stop light for defendant to stop. The defendant, however, continued his course and suddenly, when 75 feet separated the two cars, altered his course, aiming his vehicle directly at the officer's car. Just before a head-on collision between the two vehicles, the officer observed defendant appear to clench his teeth and tighten his grip on the steering wheel. Immediately after the collision, the defendant physically attacked the officer, shouting: "I didn't kill you this way, but I will kill you now." (*Id.*, 224 Cal.App.2d at p. 41.) After the accident, it was found that 21 feet of locked skid marks were made by the defendant's vehicle. Defendant argued that this proved he had no intention of colliding with the officer's vehicle. The court disagreed, stating: "Defendant during these last moments had made no effort to veer, or change direction so as to avoid the officer's vehicle. Moreover, even though the skid marks did indicate a last moment change of intent (perhaps motivated by realization that in his effort to harm the officer he himself would be injured), guilt for the consequences of the force defendant had set in motion was not thereby absolved." (*Id.* at p. 41.)

*Claborn* is fundamentally different from the case *sub judice*. In that case, the automobile was used deliberately as a deadly weapon with in-

tent to injure the officer. The belated and ineffectual application of the brakes did not negate the preexisting intent. Here, defendant's conduct does not transcend recklessness, but it is the very warp and woof of the reckless conduct regulated by a well-defined statutory classification of culpable conduct in the operation of a motor vehicle.

In *People* v. *Finney, supra,* 110 Cal.App.3d 705, the defendant was fleeing from Police Officer Peterson at speeds ranging up to 100 miles per hour. Peterson attempted to pass defendant in the fast lane after he had lightly bumped the rear of defendant's car in a vain effort to have him pull off the road. Defendant rammed Peterson's car, causing it to spin off the road. Officer Garcia, driving a car with lights and siren activated, ahead of defendant's vehicle, was rammed in its left side by defendant when he caught up with Garcia's vehicle. Officer Peterson, who had resumed pursuit, caught up with defendant and again attempted to pass him in the fast lane. Defendant again struck Peterson's car, but this time Peterson retained control and was able to slow defendant's car by maneuvering in front. Officer Garcia tried to force defendant off the road, but defendant veered into his car, causing him to lose control. Defendant then eluded Peterson, who continued the chase and tried for a third time to pass defendant. For the third time, defendant rammed Peterson's car, this time with such force as to disable it.

One hundred yards ahead of defendant and the pursuing patrol cars was California Highway Patrol Officer McDade in a marked car with its lights flashing. As defendant came alongside McDade, he swerved from his own lane and struck the side of McDade's vehicle. McDade regained control and forcefully struck defendant's car with his own, putting an end to defendant's flight.

During the chase, defendant's driving pattern was straight whenever pursuing patrol cars backed off. Although successively hitting marked patrol vehicles at least five times, defendant had passed more than twenty civilian vehicles without hitting them.

Among other offenses, defendant was convicted of two counts of assault on a peace officer with a deadly weapon and by means of force likely to produce great bodily injury. His claim that these convictions were unsupported by substantial evidence was rejected. The court reasoned: "Defendant's continuous course of conduct in repeatedly ramming well-marked patrol cars while otherwise avoiding civilian vehicles strongly supports the jury's implied finding of the general intent

required for an assault; merely because such evidence may not be inconsistent with mere recklessness does not compel an inference thereof. (*People* v. *Rocha, supra,* 3 Cal.3d 893.)" (*Id.* at p. 716.)

We are in full agreement with *Finney*—its facts support no other conclusion. Those very facts, however, serve eloquently to distinguish the *Finney* case from the instant one, which is controlled by the principle enunciated in *People* v. *Rocha, supra,* 3 Cal.3d 893.

We are aware that high velocity flights from the police in an automobile by felons seeking to escape detection are an almost quotidian occurrence on metropolitan streets. The Legislature might be well-counseled to consider an amendment of either the Vehicle Code or the Penal Code to make reckless driving while trying to escape from the police during or immediately after the perpetration of a felony a separate offense with enhanced penalties. However, we cannot usurp the legislative function and create such an offense by fiat, however much we may deplore the conduct here involved. To transmogrify virtually every car accident involving flight from the police in which injury occurs from reckless driving alone into an assault with a deadly weapon would disfigure the symmetry of the law. We may not torture the statute nor engender new legal fictions to metamorphose reckless driving into assault with a deadly weapon. The law must denominate conduct by its rightful name.

We therefore hold that the court was in error in concluding that reckless driving in violation of section 23104 of the Vehicle Code per se generated a transferable intent to commit a battery via automobile in violation of Penal Code section 245, subdivision (a).

The judgment is reversed.

Spencer, P. J., concurred.

**HANSON (Thaxton), J.**—I respectfully dissent. I would affirm the trial court as to defendant's conviction of assault with a deadly weapon (automobile) in violation of Penal Code section 245, subdivision (a), (count I) but would remand the case for the limited purpose of resentencing for the trial court to comply with California Rules of Court, rule 433, in respect to documenting the facts and reasons for imposing the upper term.

In affirming the judgment of conviction of assault with a deadly weapon (Pen. Code, § 245, subd. (a)), my reasoning follows:

*First*, there is no doubt that a car can be operated in such a manner as to constitute a "deadly weapon." (See *People* v. *Claborn* (1964) 224 Cal.App.2d 38 [36 Cal.Rptr. 132]; *People* v. *Finney* (1980) 110 Cal. App.3d 705 [168 Cal.Rptr. 80].)

*Second*, in the recent case of *Finney*, noted in the majority opinion, the defendant was convicted, amongst other things, of two counts of assault on a peace officer with a deadly weapon and by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)) and of reckless driving (Veh. Code, § 23103) arising out of defendant's ramming of a police vehicle during a chase. The chase occurred on the Interstate 5 freeway at speeds ranging from 40 to 100 miles per hour. The appellate court in affirming the judgment as to all counts of which defendant was convicted stated in respect to the assault with a deadly weapon count at page 716 the following: "Here, ample evidence supports the jury findings that defendant assaulted Officers Peterson and McDade with a deadly weapon in violation of Penal Code section 245, subdivision (b). Defendant's continuous course of conduct in repeatedly ramming well-marked patrol cars while otherwise avoiding civilian vehicles strongly supports the jury's implied finding of the general intent required for an assault; merely because such evidence may not be inconsistent with mere recklessness does not compel an inference thereof. (*People* v. *Rocha, supra*, 3 Cal.3d 893.)"

In *Finney* the requisite general intent for an assault was supplied by the fact of the defendant's continuous course of conduct in repeatedly ramming well-marked patrol cars while otherwise avoiding civilian vehicles.

In the case at bench by a parity of reasoning with *People* v. *Lathus* (1973) 35 Cal.App.3d 466 [110 Cal.Rptr. 921], I conclude the requisite elements for an assault are well supplied by the fact that the defendant drove a high-powered sports car through residential streets at speeds at night without lights in excess of 100 miles per hour "blowing" red lights which resulted in the complete destruction of both the police car and the new Datsun and the severe injury to Officer Rose as well as injury to the defendant himself. I see little difference from deliberately shooting a gun into a stalled car as in *Lathus* and the deliberate manner, inherently dangerous to others with a conscious disregard for human

life, in which the defendant herein propelled his car (like a bullet) through residential streets in the manner described. Defendant's conduct could have resulted in the wiping out of pedestrians or entire families lawfully crossing intersections on green lights and unquestionably his conduct was so inherently dangerous to others displaying a conscious disregard for human life as to constitute an assault with a deadly weapon as in *Lathus*.

*Finally*, I am aware of no law which provides that when a vehicle is the instrumentality of causing injury or death to another that any criminal proceedings flowing therefrom are strictly limited to the ambit of those provided by the Vehicle Code. "Symmetry of the law" is desirable. However, the basic concept that, where the facts so indicate, prosecuting authorities are not precluded from charging and proving up any crime cognizable by law should predominate over a possible "disfigurement" of such "symmetry."

Respondent's petition for a hearing by the Supreme Court was denied March 3, 1981. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.