[No. B067180. Second Dist., Div. Three. July 12, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
HERIBERTO CONTRERAS, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to rule 976.1 of the California Rules of Court, it is ordered that the opinion be partially published and that the following portions be deleted from the published version: parts 2, 3, 4 and 5 of the Discussion.

946

**COUNSEL**

Wesley A. Van Winkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

Linda C. Johnson and Lance E. Winters, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KLEIN, P. J.—Defendant and appellant Heriberto Contreras appeals the judgment entered following his conviction by jury of second degree murder. (Pen. Code, § 187.)[1] Contreras also pleaded guilty to a violation of Vehicle Code section 14601, subdivision (a), and admitted two prior convictions for violations of the same section within five years of the instant offense. The trial court sentenced Contreras to a term of 15 years to life in state prison.

Because the circumstances of this case support the jury's finding Contreras harbored implied malice when he caused a fatal traffic collision, and none of the remaining contentions raised by Contreras warrants reversal, the judgment is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

A child died as a result of injuries sustained in a traffic collision on February 10, 1991. The collision occurred when a tow truck driven by Contreras rear-ended the vehicle in which the child was a passenger.

The People presented evidence establishing a pattern of reckless driving by bandit tow truck drivers in general and by Contreras in particular. Contreras had received numerous citations for traffic violations, had been arrested for reckless driving, had a prior accident, and actively was racing other tow truck drivers to an accident scene at the time of the fatal collision. Further, the evidence indicated Contreras knew the brakes on his tow truck were not functioning properly on the day of the collision.

We set forth the evidence which supports the jury's finding of implied malice in accordance with the usual rule of appellate review. (*People* v. *Thomas* (1992) 2 Cal.4th 489, 514 [7 Cal.Rptr.2d 199, 828 P.2d 101]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

1. *The prosecution's evidence.*

a. *Illegal tow truck drivers.*

Los Angeles Police Detective Stephen Bernard testified he investigates the operation of illegal tow truck drivers in the City of Los Angeles. These

---

[1]All subsequent statutory references are to the Penal Code, unless otherwise specified.

drivers, referred to as "bird-doggers" or "tow bandits" illegally monitor emergency calls on police scanners and race to accident scenes. The first driver to arrive at the scene has the pick of which disabled vehicle to tow. Competition is created by the fact an automotive repair shop will pay between $500 and $1,500 for damaged high-value cars. Bird-doggers generally have poor driving records.

Admitted bird-dogger Anthony Reedburg testified Contreras was his friend and employee. At the time of the accident in issue, Reedburg controlled 33 tow trucks working out of Empire Auto Restoration. Contreras worked out of Harbor Tow which Reedburg also controlled. Reedburg testified body shops paid approximately $600 for damaged new cars but admitted he had received as much as $3,000 for a damaged vehicle.

   b.   *Contreras's prior violations.*

   (1)   *Speeding on May 17, 1990.*

On May 17, 1990, Los Angeles Police Officer Stephen Scallon saw Contreras driving a blue Mustang at 58 miles per hour in a 35-mile-per-hour zone on Adams Boulevard. Scallon cited Contreras for speeding and for driving on a revoked or suspended license. Contreras signed the citation.

   (2)   *Red light on June 16, 1990.*

On June 16, 1990, Los Angeles Police Officer Billy Holland saw Contreras turn right onto Soto Street in a gray Volkswagen without stopping for the red light. Contreras was approximately 15 seconds late for the light. Holland cited Contreras for failing to stop at a red light, no driver's license in his possession, and lack of proof of insurance. Contreras signed the citation.

   (3)   *Speeding on July 4, 1990.*

On July 4, 1990, California Highway Patrol Officer Melanie Nava saw a Chevrolet tow truck driven by Contreras pass her on the freeway at approximately 90 miles per hour. Nava drove at 115 miles per hour to catch the truck and paced it at approximately 85 miles per hour. Contreras "was traveling in and out, using all lanes of travel." Nava stopped the truck, advised Contreras he had been driving recklessly, and told him he could be arrested for reckless driving. Nava cited Contreras for speeding because traffic conditions were light. Contreras signed the citation.

(4)  *Unsafe lane changes and following too closely on September 11, 1990.*

On September 11, 1990, Los Angeles Police helicopter pilot Frank King noticed a tow truck speeding in a residential area at 50 to 60 miles per hour. The truck slowed down when it went through stop signs but never went less than 30 miles per hour. King thought the truck was stolen.

Los Angeles Police Officer Cornell Greer received a radio broadcast from King and followed a tow truck driven by Contreras on San Vicente Boulevard. Contreras made numerous unsafe lane changes and followed vehicles too closely. When the truck stopped at an accident scene, Greer cited Contreras for unsafe lane changes, following too closely, and not wearing a seat belt. Greer noted on the citation Contreras's driving had nearly caused several traffic accidents. Greer told Contreras his driving could have resulted in arrest for reckless driving.

(5)  *Reckless driving arrest on September 17, 1990.*

On September 17, 1990, at 10 a.m., Culver City Police Detective Maurice Vidican was stopped at a red light at Jefferson Boulevard and Overland Avenue in an unmarked police vehicle. Vidican noticed a tow truck approach from behind and enter the right-turn-only lane as if it were going to turn south. Vidican proceeded as the light changed but "the tow truck shot . . . directly in front of me." Vidican had to slam on his brakes to avoid hitting the truck. Vidican followed the truck which was traveling at speeds between 90 and 100 miles per hour on Jefferson Boulevard and weaving in and out of traffic. Vidican radioed for assistance and identified Contreras when other officers stopped the truck at an accident scene at Jefferson and La Cienega Boulevards.

Contreras was arrested for reckless driving.

(6)  *Unsafe U-turn on September 17, 1990.*

On September 17, 1990, at 4:40 p.m. Inglewood Police Officer Jeffrey Steinhoff was northbound on La Cienega Boulevard at La Tijera Boulevard when he heard a report of a traffic accident. He saw a fire truck driving toward the accident followed by a tow truck "going from lane to lane" and travelling at 65 to 70 miles per hour.

At the accident scene the tow truck stopped in the southbound lanes of La Tijera, turned on its emergency lights, and made a U-turn crossing double yellow solid lines and "causing the northbound traffic to come to a sudden halt." Contreras stopped next to the accident and held up traffic. Steinhoff

cited Contreras for unsafe U-turn and no driver's license in his possession. Steinhoff discussed with Contreras the near collision Contreras had caused.

(7) *Traffic accident of October 6, 1990.*

On October 6, 1990, Renon Baker, a private citizen, noticed a tow truck tailgating her vehicle. The truck sped past her at 55 to 60 miles per hour. Ahead of them, a passenger vehicle rolled through a stop sign in an attempt to "beat the tow truck. [¶] But the tow truck was going too fast, and . . . hit him." The passenger vehicle was pushed onto the sidewalk. Contreras told Baker, "I know I was going too fast."

(8) *Speeding on January 18, 1991.*

On January 18, 1991, Los Angeles Police Officer William Rugh saw Contreras driving a tow truck westbound on Slausen Avenue traveling in excess of 70 miles per hour in a 35-mile-per-hour zone and passing other vehicles. Rugh advised Contreras his driving was reckless and could kill someone. Rugh cited Contreras for speeding and Contreras signed the citation.

(9) *Red light on February 7, 1991.*

Los Angeles Police Officer Ellen Perez testified that on February 7, 1991, she saw a tow truck driven by Contreras go through a red light on Manchester Boulevard. Contreras was 15 feet late for the light and was traveling at 40 to 45 miles per hour. Perez cited Contreras for failing to stop for a red light and driving with a suspended driver's license. Contreras signed the citation.

(10) *Notification of suspended driving privilege on January 19, 1991.*

On January 19, 1991, Los Angeles Police Officer Robert Di Paolo issued Contreras a Department of Motor Vehicles form formally advising Contreras his license had been suspended or revoked and he could not operate a motor vehicle in California. Contreras signed the form in Di Paolo's presence.

Roger Muro, a principal hearing officer with the Department of Motor Vehicles, testified that on February 10, 1991, Contreras's driver's license remained suspended.

c. *Reedburg's trial testimony.*

On February 9, 1991, Contreras drove his truck to Reedburg's house and told Reedburg, " 'Something [is] wrong with the brakes again on the truck. I need your truck.' " Contreras borrowed Reedburg's truck and left.

The next morning, February 10, 1991, Reedburg drove Contreras's truck to Empire Auto Restoration. Reedburg testified, "[Y]ou couldn't go 30 miles an hour in the truck and stop, . . . [¶] The truck didn't have no brakes. [*Sic.*]" The brake pedal went all the way to the floorboard.

Contreras arrived at the shop at 8 a.m. and asked about his brakes. Reedburg told him they were "no good." Contreras answered, " 'Yeah, that's why I brought the truck to you, so you can get it taken care of.' " Reedburg told Contreras the truck could be driven no more than 10 or 15 miles an hour and "if you got behind anybody, that you would have a wreck."

Contreras returned one hour later. Although Contreras's truck had been moved to an area normally reserved for repaired vehicles, Reedburg told Contreras the truck was not ready. Contreras became angry and left in Reedburg's truck. He returned at approximately 10 a.m.

At this point, Reedburg's accounts of the day's activities varied. At the preliminary hearing, Reedburg testified he was with Contreras between 9:30 a.m. and noon waiting for a mechanic to arrive to fix the brakes. When an accident report came over the police scanner, about 10 drivers, including Contreras, "took off."

At trial, Reedburg testified Contreras left Empire Auto Restortion and returned a third time at approximately 11:30 a.m. The accident call came in shortly after Contreras returned and before Reedburg had a chance to tell Contreras the brakes had not yet been fixed.

Under both accounts, Contreras had the keys to Reedburg's truck but took the keys to his own truck and left in it in response to the accident report. Reedburg was unable to stop Contreras and had not told Contreras his brakes had been fixed. Reedburg tried to call Contreras on the radio but could not reach him.

Reedburg heard about an accident at 54th Street and Denker Avenue over the radio and went to the scene. Contreras was crying and told Reedburg the brakes had failed. Contreras left the scene with another tow driver but returned when Reedburg radioed to him. In a telephone conversation two or three weeks before the trial, Contreras told Reedburg not to say Contreras knew the brakes were bad.

Reedburg further testified Contreras could not receive the radio call regarding the brakes because the radio in Contreras's truck was inoperable. However, in a statement to Officer Jiminez taken April 12, 1991, which

Reedburg read and signed, Reedburg said the radio was on and working in Contreras's truck before and after the accident. Reedburg told Jiminez he heard Contreras's radio receiving broadcasts at the scene of the accident.

Approximately one year before the accident, Reedburg had been a passenger in a tow truck driven by Contreras. Reedburg made Contreras pull over and Reedburg insisted on driving. He told Contreras "he was likely to kill somebody driving the way he drives."

Reedburg testified he had never driven down Denker Avenue from Empire Auto Restoration, the route to the accident, without using his brakes.

d.  *Facts related to the fatal collision.*

At approximately noon on Sunday, February 10, 1991, Charles Mason saw 2 tow trucks racing side by side north on Denker Avenue at 60 to 70 miles per hour. They hit a dip at 55th Street, went airborne and made screeching sounds when they landed but did not slow down. The tow truck driven by Contreras rear-ended a car stopped at the red light at the intersection of 54th and Denker.

Margaret Ledlow heard the trucks "bottom out" at 55th Street and ran to her porch. She saw two tow trucks racing toward her "side-by-side down the street." The trucks were travelling at "freeway speed, 55 maybe 60 miles per hour, if not faster." Contreras's truck, which was on the correct side of the street, hit a car stopped for a red light at 54th and Denker. The car "went up into the air" across the intersection and into a parked car. The driver of the other tow truck refused to assist and left the scene. Contreras stayed and tried to help the victims.

The car struck by Contreras was driven by Nadine Lashley. She was on her way home from Sunday school with nine-year-old Lalisa Stewart and thirteen-year-old Jerry Williams. Lashley and Stewart suffered various injuries and both were hospitalized. The parties stipulated Jerry Williams died on February 10, 1991, as a result of the injuries received in the collision. The speed limit on Denker Avenue is 25 miles per hour.

2.  *Defense.*

Los Angeles Police Officer Richard Haberland, an accident reconstruction expert, investigated the fatal accident and estimated the truck had been traveling at a minimum speed of 47.7 to 54 miles per hour when the front wheels locked, based on the 177.5 feet of skid marks at the scene. Haberland

opined, had the truck's brakes been working properly, there was a 75 percent chance the truck would have stopped before impact.

On cross-examination, Haberland testified he had given Contreras the benefit of every doubt when estimating the coefficient of friction of the roadway and the tires and assumed the front wheels supply only 50 percent of the braking power of the vehicle. Also, Haberland assumed the rear brakes had not contributed at all to the deceleration of the truck and disregarded the energy consumed in the crush deformation of the vehicles in the crash. Each of these factors would increase the minimum speed calculation Haberland reached.

### 3. *Rebuttal*

Roger Newsock, senior staff analysis engineer for General Motors, inspected the brakes on Contreras's 1990 Chevrolet truck. He found the front and the rear hydraulic systems and the front brakes were in good condition. However, the rear brakes were completely worn. Although average brake pedal movement is four and a half inches, the brake pedal on Contreras's truck moved seven and a quarter inches when depressed.

## CONTENTIONS

Contreras contends his conviction of the crime of murder must be reversed, the trial court admitted highly prejudicial irrelevant evidence, the prosecutor committed misconduct, and the cumulative effect of these errors requires reversal. In a supplemental brief, Contreras asserts the standard instruction on reasonable doubt is constitutionally defective.

## DISCUSSION

### 1. *Contreras properly was charged with and convicted of murder.*

#### a. *The propriety of the charge.*

Contreras contends an accidental homicide which does not involve a high speed chase or drug impaired driving cannot be classified as murder under California law. He concludes his conviction must be reversed.

This claim is meritless.

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice is implied "when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.)

Manslaughter by contrast is the unlawful killing of a human being without malice. (§§ 191.5, subd. (a), 192.) The required level of culpability for either gross vehicular manslaughter while intoxicated (§ 191.5) or vehicular manslaughter (§ 192, subd. (c)) is gross negligence. (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1204 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People* v. *Bennett* (1991) 54 Cal.3d 1032, 1036 [2 Cal.Rptr.2d 8, 819 P.2d 849].) Both statutes expressly provide they "shall not be construed as prohibiting or precluding a charge of murder under Section 188 upon facts exhibiting wantonness and a conscious disregard for life to support a finding of impled malice, or upon facts showing malice consistent with the holding of the California Supreme Court in People v. Watson [1981] 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279]." (§§ 191.5, subd. (d), 192, subd. (c)(3).)

■ *People* v. *Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279], distinguished gross negligence from implied malice in a drunk driving case. Gross negligence was defined as the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. Implied malice requires proof the accused acted deliberately with conscious disregard for life.

"Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence. [Citations.] [¶] . . . A finding of gross negligence is made by applying an *objective* test: if a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness. [Citation.] However, a finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard. [Citation.]" (*People* v. *Watson, supra,* 30 Cal.3d at pp. 296-297.)

■ It is the " ' "conscious disregard for human life" ' " that sets implied malice apart from gross negligence. (*People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 109 [13 Cal.Rptr.2d 864, 840 P.2d 969]; *People* v. *Dellinger* (1989) 49 Cal.3d 1212, 1221-1222 [264 Cal.Rptr. 841, 783 P.2d 200]; *People* v. *Protopappas* (1988) 201 Cal.App.3d 152, 162-164 [246 Cal.Rptr. 915].) "Even if the act results in a death that is accidental, as defendant contends was the case here, the circumstances surrounding the act may evince implied malice. [Citations.]" (*People* v. *Nieto Benitez, supra,* 4 Cal.4th at p. 110.)

Considerations such as whether the act underlying the homicide is a felony, a misdemeanor or inherently dangerous in the abstract, are not dispositive in assessing whether a defendant acted .with implied malice. (*People* v. *Nieto Benitez, supra,* 4 Cal.4th at pp. 106-108.) A finding of

implied malice must be based upon "consideration of the circumstances preceding the fatal act. [Citations.]" (*People* v. *Nieto Benitez, supra,* 4 Cal.4th at p. 107.)

Thus, the absence of intoxication or high speed flight from pursuing officers does not preclude a finding of malice. These facts merely are circumstances to be considered in evaluating culpability. Where other evidence shows "a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied. (§ 188.) In such cases, a murder charge is appropriate." (*People* v. *Watson, supra,* 30 Cal.3d at p. 298; *People* v. *Young* (1992) 11 Cal.App.4th 1299, 1309 [15 Cal.Rptr.2d 30]; *People* v. *Olivas* (1985) 172 Cal.App.3d 984, 988-989 [218 Cal.Rptr. 567].)

Based on the foregoing authorities, it is clear Contreras properly may be charged with murder in this case even though he was sober and was not involved in a high-speed chase with police at the time of the fatal collision.

b. *Factual sufficiency.*

Contreras contends there is no evidence to support the finding he had the requisite subjective knowledge his conduct created a substantial risk of death to another. Rather, his intent was "merely to be the first on the scene to get a towing job." Contreras argues this "goal was completely contrary to a subjective knowledge of a substantial risk of death because any accident, let alone a fatal one, would be certain to frustrate it." Contreras submits the evidence establishes only negligent operation of the truck. He asserts the evidence did not conclusively establish he drove the truck knowing the brakes were defective and the fact Reedburg tried to radio Contreras shows Contreras had a reasonable basis to believe the brakes had been repaired.

Contreras further argues even if he knew or suspected the brakes were defective, the evidence did not demonstrate a conscious disregard for life because he tried to stop the truck which skidded halfway down the block, and attempted to help the victims after the collision.

Contreras's attack upon the sufficiency of the evidence fails.

In evaluating the evidence in a criminal case, we determine whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. We must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 38 [23 Cal.Rptr.2d 593, 859 P.2d

673]; *People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]; *People* v. *Johnson, supra,* 26 Cal.3d at pp. 576-578; see *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781].)

The same standard applies to the review of circumstantial evidence. (*People* v. *Ceja* (1993) 4 Cal.4th 1134, 1138 [17 Cal.Rptr.2d 375, 847 P.2d 55]; *People* v. *Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253].)

■ "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]" (*People* v. *Bean, supra,* 46 Cal.3d at pp. 932-933, internal quotation marks omitted.)

■ The arguments advanced by Contreras on appeal were rejected by the jury. Clearly, the evidence was sufficient to show Contreras subjectively was aware of the risk to human life posed by his driving and that he consciously and deliberately disregarded that risk. (*People* v. *Klvana* (1992) 11 Cal.App.4th 1679, 1703-1704 [15 Cal.Rptr.2d 512]; *People* v. *Protopappas, supra,* 201 Cal.App.3d at pp. 166-172; *People* v. *Summers* (1983) 147 Cal.App.3d 180, 184-185 [195 Cal.Rptr. 21].)

Based on his driving record, his prior accident, and the known inadequacy of his brakes on the date in question, the issue was not whether Contreras would have a serious traffic accident, but when.

Although there was evidence from which it could be argued Contreras believed his brakes had been repaired, the jury was entitled to reject that interpretation in favor of the more credible and substantial evidence which demonstrated Contreras knew his brakes were malfunctioning and had not yet been repaired.

Moreover, even if the jury believed Contreras thought the brakes had been repaired at the time he got into the truck, the jury was entitled to conclude he knew they were damaged before he reached 54th and Denker. Reedburg testified he had never driven from Empire Auto Restoration to 54th and Denker without applying the brakes. Because the brake pedal on Contreras's truck went to the floor when depressed, Contreras knew the first time he applied them they had not been repaired.

Thus, the evidence indicates Contreras knew the truck's brakes were defective at the time of the fatal crash and that he drove recklessly, racing at high speed in a residential area, anyway. Certainly the jury rationally could conclude the evidence demonstrated conscious disregard for life.

The fact Contreras did not immediately flee the accident scene must be balanced against Reedburg's testimony Contreras did eventually flee and had to be called back by Reedburg over the radio before the police arrived.

Contreras also argues his conduct was not as aggravated as the high-speed chase in *People* v. *Cotton* (1980) 113 Cal.App.3d 294 [169 Cal.Rptr. 814], which resulted in reversal of an assault with a deadly weapon conviction for insufficiency of the evidence. However, *Cotton* merely held reckless driving with injury in violation of Vehicle Code section 23104 does not, per se, generate a transferable intent to commit a battery with an automobile in violation of section 245, subdivision (a). As no similar presumption was made here, *Cotton* is distinguishable.

For all the foregoing reasons, there is substantial evidence to support the jury's finding Contreras subjectively knew his driving created a substantial risk to human life and consciously disregarded that danger. Accordingly, this claim of error fails.

2.-5.*

. . . . . . . . . . . . . . . . . . . . . .

## CONCLUSION

Contreras properly was charged with and convicted of second degree murder, the trial court committed no evidentiary error, the prosecutor did not commit reversible misconduct and the trial court did not err in giving the standard jury instruction on reasonable doubt.

## DISPOSITION

The judgment is affirmed.

Croskey, J., and Kitching, J., concurred.

A petition for a rehearing was denied August 8, 1994, and appellant's petition for review by the Supreme Court was denied October 26, 1994.

---

*See footnote, *ante*, page 944.