Filed 6/27/23  P. v. Phillips CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MELCHESTER PHILLIPS,<br><br>    Defendant and Appellant. | F084725<br><br>(Super. Ct. No. 19CMS0573)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Michael L. Reinhart, Judge.

Patrick J. Hennessey, Jr., for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Chung Mi Choi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Following a court trial, appellant Melchester Phillips was convicted of four counts of assault with a deadly weapon, to wit a vehicle (Pen. Code,[1] § 245, subd. (a)(1); counts

---

[1]    All further undesignated statutory references are to the Penal Code.

1-4) and one count of reckless driving on a highway causing a specified injury (Veh. Code, §§ 23103, subd. (a), 23105; count 5) arising out of an incident where he ran a red light and collided into a Tesla, seriously injuring its driver and three of the passengers. As to each count—one for each victim—the court found true allegations that appellant had inflicted great bodily injury (GBI) in the commission of the offenses (§ 12022.7, subd. (a)). The court also found appellant had suffered one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) and a serious felony conviction (§ 667, subd. (a)(1)).

Appellant was sentenced to an aggregate prison term of 18 years, broken down as follows: as to count 1, the midterm of three years doubled to six years due to the strike prior, plus three years for the GBI enhancement; as to counts 2, 3, and 4, one-third the midterm of two years each, plus one year each for the GBI enhancements. The court stayed punishment as to count 5, pursuant to section 654, and struck the prior serious felony enhancement.

On appeal, appellant contends his convictions for counts 1 through 4 must be reversed because the evidence was insufficient to support that he had the requisite intent to commit the offenses. He also contends the matter must be remanded for resentencing because the court based its decision to impose consecutive terms on counts 2, 3, and 4 in part on a mistaken belief it had no discretion to impose concurrent terms.

Respondent concedes appellant must be resentenced. We accept respondent's concession and remand for a full resentencing. In all other respects, we affirm the judgment.

**FACTS**

**Prosecution Case**

This case arises from a traffic collision that took place on November 18, 2018, in Kettleman City, at the intersection of the Interstate 5 on-ramp and Highway 41. The intersection is controlled by a traffic light. In the minutes preceding the collision, appellant's pickup truck was observed traveling northbound on Highway 41. In this area,

Highway 41 is a single two-lane road with traffic traveling northbound in one lane and southbound in the other, and the speed limit is 55 miles per hour.

According to witness David Tittle, who was also traveling northbound on Highway 41 about 10 to 12 car lengths in front of appellant's vehicle in the minutes before approaching the intersection, appellant was doing "some very dangerous passing [and] flashing [his] headlights" drawing Tittle's attention. Appellant would pass into the other lane "over double yellow[ lines and on] blind curves." Tittle observed appellant pulling out into oncoming traffic, then realizing he did not have space to pass, and pulling back into the northbound lane. After overcoming several cars behind Tittle, appellant passed Tittle at, by Tittle's estimation, over 65 miles per hour. Tittle saw appellant continue to pass cars in front of him. Appellant's driving pattern made Tittle feel unsafe.

Tittle approached a hill before the intersection and lost sight of appellant; when he got over the hill, he saw there had been a collision in the intersection involving appellant. Appellant's vehicle had front end damage, and Tittle also observed a silver vehicle with some damage, and a Tesla with rear passenger damage. Tittle stopped to provide assistance to the Tesla; the driver's side window was broken and the airbags had deployed. The Tesla's driver's head was slumped down, and he did not appear to be breathing. In addition to the driver, a woman was in the passenger seat, and there were three children in the back. While Tittle was providing assistance to the Tesla passengers, he heard appellant screaming, "you mother fucker, you made me late for a wedding."

Stephanie Conley was in her vehicle stopped at a red light on southbound Highway 41 waiting to turn left onto the Interstate 5 on-ramp. She was in the innermost left turn lane of two left turn lanes and the second car in line, behind the Tesla. When her light turned green, the vehicles started to drive into the intersection, at which point appellant's vehicle "came through the intersection and slammed into the Tesla." The Tesla "was hit so hard it got pushed really quickly through the intersection." Conley's vehicle was also struck by appellant's vehicle, and her front bumper was pushed into her

3.

driver's side wheel.  After the collision, she heard appellant saying "multiple times really loudly, 'you mother fuckers, you mother fuckers.' "  When Conley was turning into the intersection, she had observed oncoming vehicles stopped at their limit line.

Kelly Grace was on southbound Highway 41, waiting at the red light in the lane going straight.  When the light turned green, she remembers seeing appellant's vehicle not slowing down and telling her husband who was in the vehicle with her that appellant was going to run the red light.  She did not see the collision but as they were about to go through the intersection, she "heard an incredible impact."

Katherine Kang was stopped at the red light in the left turn lane next to the Tesla. When the light turned green, Kang waited two seconds, as was her "habit," and then started turning left into the intersection.  She usually counted two seconds before entering an intersection after a light turned green because she had seen too many people run red lights.  As soon as she turned the corner, a vehicle hit the back of her car and she felt "the whole car fishing" and all the airbags deployed.

Zoya Veis was the passenger of the Tesla.  Her husband was driving, and her three children were in the backseat.  They were waiting to turn left onto Interstate 5, and when the light turned green, they proceeded into the intersection.  Upon turning, she heard an "immensely loud sound" and felt "immediate pain."  What collided with her car "just came out of nowhere."

As a result of the accident, Veis's son had a fracture on his neck "in a very dangerous spot"; he needed two surgeries and was never going to be able to play hockey again.  One of her daughters suffered lacerations to her liver and a concussion.  Veis suffered a concussion, a bruised knee, and fractured ribs.  At the time of her testimony, she still experienced a fast heart rate and anxiety from the collision.  Her husband was unconscious at the scene and did not regain consciousness until 15 days later.  He was in the hospital for two and a half months.  He was very active prior to the collision but was no longer able to play hockey, ride a bike, help with daily chores or childcare, or drive.

4.

He had to have a monitor put in his brain, and was "a completely different person," with "no capacity to be the person he was before."

California Highway Patrol Officer Walter Kennedy responded to the scene of the collision. At trial, he explained once the northbound lane approaches the intersection, it turns into two lanes. He further explained there were skid marks caused by appellant's vehicle within the intersection past the limit line. The skid marks indicated to Kennedy that appellant's vehicle did not stop prior to the limit line and passed into the intersection before he applied the brakes.

Kennedy testified the traffic lights on northbound Highway 41 were visible from a distance of about a half mile to three quarters of a mile. He testified the left turn onto Interstate 5 from southbound Highway 41 was a controlled left turn light with a green arrow. He explained the procedure for the lights at the intersection: when the lights for northbound and southbound Highway 41 turn red, the light at the off-ramp from southbound Interstate 5 would turn green, with cars turning right to get onto southbound 41, left to get onto northbound Highway 41, or straight to get on the on-ramp to get back on southbound Interstate 5; when that light finishes its cycle, the next lights that turn green were the light for the left turn lanes from southbound Highway 41 to the southbound Interstate 5 on-ramp and the light for lanes traveling straight on southbound Highway 41; when the light for the left turn lanes turn red, the light on northbound Highway 41 turn green and the light for lanes traveling straight on southbound Highway 41 remain green. The sequence was not timed; it was weighted.

**Defense Case**

Appellant testified in his defense. He testified he was from Washington state and had resided in California since 2017. On the day of the collision, he was traveling from Paso Robles with his boss to take her to her son's wedding in Sacramento. His boss told him it would take three hours to get to the wedding. They left Paso Robles at approximately 11:30 a.m., and the wedding was at 5:00 p.m. He was not familiar with

the central coast or central valley area; he was just following his boss's directions. He admitted that in the minutes leading up to the collision, he passed other cars two or three times. When asked if he passed in a safe legal way, he responded, "Well, I mean, I am not suicidal, yeah." He testified he only passed when the dividing line was broken and believed he was driving in a safe manner. He was going 65 miles per hour, with the flow of traffic. The maximum speed he reached was 70 miles per hour, which he may have reached while he was passing, but he would slow down when he got back into his lane.

Appellant further testified that when he went through the Highway 41/Interstate 5 intersection, the light was green. He was the only vehicle going through the intersection, and saw the Tesla stopped at their light. He did not see anything else because there was a "bad sun glare." He later testified he could not tell what color the light was, but his boss told him the light was green, so he went ahead. He did not know how the Tesla got in front of him. There were no cars blocking the intersection when he entered it; he would have never entered if there were. He was not in a rush that day; in his mind there was plenty of time to get to Sacramento. He was "clear minded, clear thinking" and was only thinking of getting his boss to her son's wedding safely.

When asked to address the testimony that he was yelling "you made me late for a wedding," appellant denied saying it. He explained that after the accident, he started running to try to help the people in the Tesla, but his boss called him back because she was stuck in his vehicle, so he was yelling "mother fucker" because he "felt like they jumped in front of [him]" and that "they tried to kill [him] or something." He pulled his boss out of the vehicle and told her "my bad, we're not going to make this wedding" and apologized to her.

Appellant admitted he was going more than 55 mph through the intersection. He thought the speed limit in that area was 65 and only found out recently it was 55. He started to slow down before entering the intersection because he was unsure if the light was red, but when his boss told him it looked green to her, he accelerated and proceeded

through the intersection. When the Tesla got in front of his vehicle, he tried to brake and avoid the collision. He thought they may not have seen him because of the sun glare. He would not deliberately run into a vehicle; he did not "have a death wish," and he was not racing. The Tesla stopped right in front of him, and he went to the left to try to avoid it, but he was unable to and hit the back side of it. He testified it was an accident.

**Rebuttal Case**

In rebuttal, Officer Kennedy testified he had never seen nor had a call complaining about glare on the traffic light. He opined there was no glare on the traffic light at the time the crash happened, which was approximately 12:25 p.m. When he responded to the scene, he did not observe a glare. He further testified there were numerous speed limit signs along northbound Highway 41. The physical evidence, including the skid marks from appellant's vehicle, did not contradict appellant's statement that he tried to avoid hitting the Tesla. The skid marks indicated that at the "very last second prior to impact," appellant did apply his brakes and slightly began to turn to the left, which was consistent with trying to avoid the collision. The physical evidence further indicated that when appellant's vehicle made contact with the Tesla, the Tesla "lifted in the air," landed in another spot and then slid.

## DISCUSSION

### I. Sufficiency of the Evidence to Support Appellant's Assault with a Deadly Weapon Convictions (Counts 1-4)

Appellant contends the evidence was insufficient to support his convictions for assault with a deadly weapon in counts 1 through 4, particularly the court's finding that he had the requisite intent. We disagree.

In assessing a claim of insufficiency of the evidence, we review "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable

7.

doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 66.) Reversal on insufficiency of the evidence is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 639.)

Assault is defined in the Penal Code as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "[A]ssault requires only a general criminal intent and not a specific intent to cause injury." (*People v. Williams* (2001) 26 Cal.4th 779, 782 (*Williams*).) To find a defendant guilty of assault, the factfinder must find he was "aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (*Id.* at p. 788.) While a defendant "may not be convicted based on facts he did not know but should have known[,] [h]e … need not be subjectively aware of the risk that a battery might occur." (*Ibid.*)

Here, the trial court gave the following reasoning for its verdict. It found the light on northbound Highway 41 "had been on for some significant time as testified to both by CHP Officer Kennedy, and the witness Ms. [Kang] who … actually counted two seconds before starting her left turn." The court found the testimony that other cars were decelerating, while appellant was not, was "critical" because it showed the red light was working, other cars had time to decelerate, and a witness had enough time to see the event as well as comment to other people in her car that appellant was going to run the red light. The court also found circumstantial evidence that appellant was in a rush to get to where he was going based on his driving pattern and his statement that "you made me late to the wedding." The court found the totality of the evidence demonstrated "that as [appellant] approached this intersection in a hurry to get to this wedding had to know that

8.

there were cars that were in the process of making a turn coming into that intersection, and still choose to try and beat them through the intersection so that he would not be late." The court went on to conclude: "This elevates the crime from simply a reckless driving, and driving with a conscious disregard of the danger, to now being a direct and probable factor in causing this accident. The impact was a direct and probable result of his action trying to beat running a red light, trying to beat left hand traffic turning through the intersection so he wouldn't be late." The court found "unquestionably" that appellant's conduct was "so inherently dangerous to others as to constitute an assault with a deadly weapon."

The trial court acknowledged the skid marks created by appellant's vehicle in the intersection but noted they did not begin until appellant "was well inside of the limit line" and that appellant's testimony that the Tesla " 'jumped in front of him,' defies physics." The court explained "there was at least a 50-foot distance that those vehicles making a left turn had to turn in order to get to the spot where the impact occurred. This is all in a clear view of [appellant], and a clear opportunity to see it, and the time to see it." The court further noted that appellant's "rate of speed was such that at the time of impact it caused this Tesla not to skid across … it lifted that Tesla an appreciable distance, threw it to the side." The court rejected appellant's claim that the light was green as it was "unsupported by the evidence." The court reiterated it found beyond a reasonable doubt that appellant was aware of the facts showing that his act would directly and probably result in the application of force.

We conclude the trial court's finding that appellant harbored the requisite mental state for assault is supported by substantial evidence; that is, we conclude there is substantial evidence to support that appellant possessed knowledge of facts which would lead a reasonable person to realize a battery would directly, naturally and probably result from his conduct based on the trial court's detailed summary of the evidence and application of the proper legal standard.

9.

This case, as the trial court and respondent below as well on appeal point out, is similar to *People v. Aznavoleh* (2012) 210 Cal.App.4th 1181 (*Aznavoleh*). In that case, the appellate court found the evidence was sufficient to support an assault with a deadly weapon conviction where the defendant was deliberately racing through a red light at a busy intersection. The appellate court found the jury could reasonably conclude the defendant knew facts which would lead an objectively reasonable person to appreciate an "injurious collision, i.e., a battery" would directly and probably result from his actions based on the facts that: the defendant's passengers repeatedly told him to slow down; one of them screamed, "[i]t's red"; the defendant acknowledged he saw the vehicle he struck start turning left as he was approaching the intersection; the defendant made no effort to stop, slow down, or otherwise avoid a collision. (*Id*. at p. 1189.)

Here, like *Aznavoleh*, there was circumstantial evidence outlined in detail by the trial court that appellant knew the light was red and that other vehicles were turning left into the intersection when he sped through it anyway trying to get to where he was going. In other words, he knew of facts that would lead a reasonable person to know a battery was probable. This was sufficient to support the court's finding of intent.

Appellant urges that *Aznavoleh* is distinguishable because two older cases— *People v. Cotton* (1980) 113 Cal.App.3d 294 and *People v. Jones* (1981) 123 Cal.App.3d 83—are a better fit for analogy to his conduct in the present case. In both these cases, the appellate courts reasoned that sufficient evidence did not support assault with a deadly weapon convictions in cases involving traffic collisions because there was no evidence the defendants intended to intentionally drive into the other cars. Appellant contends he too did not harbor the intent to collide into any vehicle and thus, under these and other older authorities, his convictions must be reversed. Appellant's reliance on these cases is not persuasive, as they relied on the now rejected notion that the defendant must have the "intent to commit a battery." (See *People v. Cotton*, at pp. 302–303.)

10.

As respondent points out, both *Cotton* and *Jones*, as well as other authorities cited by appellant to support his argument, predate our Supreme Court's decision in *Williams*, which clarified the intent standard we have articulated above and that was articulated in *Aznavoleh*. *Aznavoleh* specifically addressed *Cotton* and *Jones*, noting *Williams* "fatally undermines both of these opinions," as pursuant to *Williams*, "a defendant need not intend to commit a battery, or even be subjectively aware of the risk that a battery might occur"; "[h]e need only be aware of what he is doing," and [t]he foreseeability of the consequence is judged by the objective 'reasonable person' standard." (*Aznavoleh*, *supra*, 210 Cal.App.4th at pp. 1189–1190.)

In his reply brief, appellant does not attempt to address this "fatal" weakness in his authorities, but rather doubles down on his reliance of them without further discussion to that set forth in his opening brief. We agree with the *Aznavoleh* court in regard to *Cotton* and *Jones* and find them and other authorities cited by appellant, which predate *Williams*, unpersuasive to the extent he is using them to support the proposition that the court was required to find he intended to collide with the Tesla to justify the assault with a deadly weapon convictions.

For the foregoing reasons, the trial court's finding appellant harbored the requisite intent to commit assault with a deadly weapon was supported by sufficient evidence, and the convictions were not error.

## II.     Court's Order of Consecutive Terms on Counts 2, 3, and 4

At sentencing, in denying appellant's request to stay punishment for counts 2, 3, and 4 pursuant to section 654, the court found section 654 did not apply and noted that each section 245 conviction "should be *and also with the strike must be mandatory consecutive sentences*." (Italics added.) When sentencing appellant on counts 2, 3, and 4, the court noted: "By *operation of law* Counts 2, 3, and 4 are each consecutive, one-third the mid term." (Italics added.)

11.

Appellant contends the matter must be remanded for resentencing because the court's imposition of consecutive terms was based on the court's belief it was required to do so under the "Three Strikes" law. Appellant contends this was a mistaken belief, as the California Supreme Court has indicated a trial court retains discretion to impose concurrent terms in three strikes cases where crimes were committed on the same occasion or arose from the same set of operative facts. (*People v. Henderson* (2022) 14 Cal.5th 34, 56; *People v. Hendrix* (1997) 16 Cal.4th 508, 512.)

Appellant contends, and respondent agrees, that his convictions were committed on the same occasion and therefore consecutive sentencing is not mandatory under the Three Strikes law but is permissible. Because the trial court appeared to be under the impression that consecutive sentences for counts 2, 3, and 4 were mandatory, the parties agree remand is appropriate. We accept respondent's concession with no further discussion.

## **<u>DISPOSITION</u>**

Appellant's convictions are affirmed. The matter is remanded for resentencing in compliance with all applicable laws in effect at the time of the resentencing for the sentencing court to exercise discretion in determining whether or not to impose consecutive sentences on counts 2, 3, and 4. We express no opinion on how the court should exercise its discretion as to this or any other issue that may arise at resentencing.


                                              DE SANTOS, J.

WE CONCUR:


PEÑA, Acting P. J.


SMITH, J.