Filed 8/25/23  P. v. Raygoza CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KAYLA GENEIRENE RAYGOZA,<br><br>Defendant and Appellant. | F083282<br><br>(Super. Ct. No. PCF380666C)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Victor Blumenkrantz; Jacquelyn E. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE DISSENTING OPINION**

# INTRODUCTION

On July 26, 2021, a jury acquitted defendant Kayla Geneirene Raygoza[1] of first and second degree murder (Pen. Code, §§ 187, subd. (a), 189, count 1),[2] but found her guilty of the lesser included offense of aiding and abetting Fabian Nilo in the voluntary manslaughter (§ 192, subd. (a), count 1)[3] of Roman Gomez.  Prior to deliberations, the jury was instructed with the aiding and abetting instruction (CALCRIM No. 401), which four of our sister courts have found to be a flawed instruction, as applied to implied malice murder, because it permits a jury to convict a defendant of second degree murder without a finding that he or she acted with implied malice.[4]  Although defendant was not convicted of second degree murder, but rather of the lesser included offense of voluntary manslaughter, the jury was still required to find she acted with either an intent to kill or a conscious disregard for human life, "i.e., the mental state ordinarily sufficient to constitute malice aforethought."  (*People v. Bryant* (2013) 56 Cal.4th 959, 970 (*Bryant*) ["voluntary manslaughter requires either an intent to kill or a conscious disregard for life"].)

On appeal, defendant contends the trial court erred when it instructed the jury with CALCRIM No. 401 because it permitted the jury to find her guilty of voluntary manslaughter:  (1) under an invalid implied malice aiding and abetting theory; and (2) without a finding she possessed either an intent to kill or a conscious disregard for human life.

---

[1]    Defendant is also identified as Kayla Easter throughout the record.

[2]    All further references are to the Penal Code, unless otherwise stated.

[3]    As we discuss further below, defendant was also convicted and sentenced to an additional offense.

[4]    *People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1265–1269; *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 592 (*Glukhoy*); *People v. Langi* (2022) 73 Cal.App.5th 972, 981–984 (*Langi*); *People v. Powell* (2021) 63 Cal.App.5th 689, 714 (*Powell*).

Although our Supreme Court recently concluded a theory of aiding and abetting implied malice murder is still a legally valid theory (*People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*)), we do find the aiding and abetting instruction (CALCRIM No. 401), as applied to imp lied malice murder, is flawed and that defendant was prejudiced as a result of the jury being provided this instruction.[5]  Accordingly, we reverse the voluntary manslaughter conviction (count 1), vacate the sentence as to both counts, and remand for further proceedings.  In all other respects, we affirm the judgment.

## STATEMENT OF CASE

On November 1, 2019, the Tulare County District Attorney filed an information charging defendant with first degree murder (§§ 187, subd. (a), 189, count 1) and assault with a deadly weapon, to wit, a motor vehicle (§ 245, subd. (a)(1), count 2).

On July 26, 2021, the jury acquitted defendant of first and second degree murder (§§ 187, subd. (a), 189, count 1), but found her guilty of voluntary manslaughter (§ 192, subd. (a), count 1) and assault with a deadly weapon (§ 245, subd. (a)(1), count 2).  As to count 1, the trial court sentenced defendant to the aggravated term of 11 years.  As to count 2, the trial court sentenced defendant to the aggravated term of four years, but stayed the sentence pursuant to section 654.

---

[5]     Defendant further contends the trial court erred "when it imposed the upper term sentence on count 1 based solely on [section] 654-stayed count 2" (unnecessary capitalization omitted), and that she is entitled to be resentenced consistent with the changes made by newly enacted Senate Bill No. 567 (2021-2022 Reg. Sess.) and Assembly Bill No. 518 (2021-2022 Reg. Sess.).  As we discuss in detail below, defendant was prejudiced as a result of the jury being provided with the flawed instruction for aiding and abetting implied malice murder (CALCRIM No. 401), and we therefore reverse the voluntary manslaughter conviction (count 1).  Because defendant is entitled to be resentenced and the trial court can readdress its sentencing decisions in light of these recent changes, we do not address the merits of defendant's additional claims.  (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior resentencing decisions when resentencing a defendant"]; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["the full resentencing rule"].)

## I.    Background

In 2019, Angela M.[6] and Roman Gomez were in a dating relationship and lived together in a house in Tulare.[7]  Roman would often be jealous and "sometimes he'd just try to swing on [her], like put his hands on [her] and stuff like that."  During one specific incident, Roman was intoxicated and became aggressive and abusive towards her.

Angela also lived in the house with her cousin, Fabian N.  Fabian and Kayla B.[8] were in a dating relationship.  Angela, defendant, and defendant's wife, Aaliyah R., were all friends.  Defendant and Fabian did not like Roman.

## II.    May 20, 2019 Incident

On the night of May 20, 2019, Angela and Roman were at the house when defendant and Aaliyah came over.  The four of them were together at the house until defendant and Aaliyah left after 10:00 p.m.  Subsequently, Angela and Roman were in their car when they got into a physical confrontation.  Roman "started just grabbing [Angela's] arms and he wouldn't let [her] go until [she] pushed him away."  Angela then went into her room and laid on her bed when Roman "started choking [her] again and pulling [her] hair."  She told Roman to leave and he then proceeded to leave the house with some of his personal belongings.

Later on defendant and Aaliyah came back to the house.  Both defendant and Aaliyah observed Roman arguing with Angela, and they told Roman to leave.  Defendant then "started getting aggressive, like trying to be physical with Roman" and "[s]he was

---

[6]    Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

[7]    Angela testified under a grant of immunity.

[8]    Kayla Bernal and Kayla Raygoza share the same first name.  Kayla Bernal will be referred to as "Kayla" throughout the opinion, whereas Kayla Raygoza will be referred to as "Defendant."

trying to put her hands on him, telling him to hurry up and leave, like pushing him away."
Defendant told Roman he was lucky Angela was there "because she wanted to hurt him."
Eventually, Roman left the house "[w]ith his stuff, like his clothes." Angela ended up
with marks on her arms as a result of this confrontation with Roman.

At or around 1:00 a.m., Angela called Fabian and he told her "he was going to
come over and [she] told him not to." Later on, Fabian texted Angela and told her he was
"OMW, on my way." Fabian, Kayla, and Caesar L. then drove over to the house in a
SUV. Fabian then hugged Angela and told her he was sorry, but "he had to do what he
had to do."[9] Fabian then left with Kayla and Caesar in the SUV. Angela went to the
bathroom and when she came back out defendant and Aaliyah were also gone.

Fabian, Kayla, and Caesar searched for Roman. The group located Roman near a
school, and Fabian and Caesar exited the vehicle and confronted Roman.[10] In
surveillance footage,[11] Fabian is observed holding a "shiny object in one of [his] hands"
while positioned "in a bladed sort of fighting stance." In the footage, Fabian and Caesar
are observed "making punching, stabbing motions towards Roman."[12] Subsequently,
defendant drove up in her gray Nissan Altima and hit Roman, Fabian, and Caesar with
her car.[13] Defendant got out of the vehicle and involved herself in the altercation, and
ended up pushing and choking Roman, along with hitting him two times. Kayla told law

---

[9] Before this incident, Fabian had told Angela that if Roman "kept putting hands on [her] that he was going to do what he had to do."

[10] It is unclear in the record whether Kayla *also* stepped out of the vehicle to confront Roman. However, what is clear is the two individuals who initially attack Roman were Fabian and Caesar.

[11] The surveillance footage was introduced and admitted as People's exhibit 10.

[12] It was later determined Roman suffered three stab wounds as a result of Fabian stabbing him with a knife.

[13] Defendant testified she "tr[ied] to break up the fight by tapping the two people in front" with her car and only "tr[ied] to scare them." It is unclear how fast defendant was driving when she hit Roman, Fabian, and Caesar with her car.

enforcement defendant was "egging on the fight" and had asked Fabian, " 'If that's all you have?  That's all?  He doesn't deserve to be here.' "  After the fight, Roman was on the ground and told the group, " 'That's enough.  Stop' … 'I'm sorry.' "

On their way home, Fabian told Kayla he wished he had done more to Roman.  Fabian then came back to the house and Angela noticed he had something "tucked in his pants," which she believed was a knife.

### III.     Subsequent Law Enforcement Investigation

Subsequently, Roman called 911 and law enforcement arrived on scene and observed him "wincing in pain, and he told [them] that he had been stabbed."  Emergency personnel then transported Roman to the hospital where he died as a result of three stab wounds.

On May 22, 2019, law enforcement located defendant in the City of Cutler in her gray Nissan Altima and placed her under arrest.  Later on, officers interviewed defendant and she admitted to hitting the group with her car and also admitted to getting out of her car and hitting Roman twice.[14]  However, defendant testified she did not intend for Roman to be killed and never encouraged anyone to kill him.

### DISCUSSION

### I.     Error Related to Jury Instruction CALCRIM No. 401

Defendant contends the trial court committed prejudicial error by instructing the jury on an invalid implied malice theory of aiding and abetting a homicide, a theory in which the prosecutor relied on during his closing argument.  Specifically, as it relates to homicide, defendant argues "implied malice is not a valid legal theory of aiding and abetting a homicide, because it contravenes the requirement that direct aiders and abettors

---

[14]     The prosecutor also admitted evidence of text messages where defendant told a friend she had "choked" or "throttled" Roman  and a conversation with Angela where she laughed about Roman's condition after the stabbing and said, " 'That he would be lucky if he got up because she hit him with a car.' "

6.

harbor a specific intent to commit the charged homicide crime." (Unnecessary capitalization and emphasis omitted.) Further, defendant argues the trial court "committed [prejudicial] instructional error by giving the standard version of CALCRIM No. 401" because "it fail[ed] to inform the jury of all of the requisite aiding and abetting elements." Based on our Supreme Court's holding in *Reyes*, we reject defendant's contention an aider and abettor to a homicide must act with express malice, but do agree the standard version of CALCRIM No. 401 given to the jury in this case was erroneous because it allowed the jury to impute malice to defendant based solely on her participation in the crime, and this error was prejudicial under the federal standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).[15]

### A. Aiding and Abetting Implied Malice Murder is Still a Valid Theory of Murder

Defendant argues the trial court erred because its aiding and abetting instructions permitted the jury to convict her even if she aided and abetted the perpetrator (Fabian) with an intent to kill (express malice), and did so with implied malice. She argues a defendant cannot aid and abet murder based on implied malice. Because our Supreme Court recently concluded a direct aiding and abetting theory of implied malice murder is still a valid theory of murder (*Reyes*, *supra*, 14 Cal.5th at pp. 990–991), we disagree.

#### i. *Applicable Law*

"A person who aids and abets the commission of a crime is culpable as a principal in that crime. (§ 31.) Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime." (*People v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*).) "[U]nder direct aiding and abetting principles, an accomplice is guilty of

---

[15]     The People do not argue forfeiture in response to defendant's instructional error claims. Under these circumstances, we will assume arguendo defendant's claims were preserved for our review, decide the merits of the claims, and forego addressing defendant's alternative ineffective assistance of counsel claims.

an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*Ibid*.) Aider and abettor liability is " 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*Powell*, *supra*, 63 Cal.App.5th at p. 710.) In other words, " '[a]n aider and abettor must do something *and* have a certain mental state.' " (*Id*. at p. 712, quoting *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

"In the context of implied malice, the [act] required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the [act] includes whatever acts constitute aiding the commission of the life endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." (*Powell*, *supra*, 63 Cal.App.5th at p. 713, fn. omitted.) As it relates to intent, "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather … he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Id*. at p. 714.) The requisite intent is a subjective one – the defendant must have "*actually appreciated* the risk involved" (*People v. Contreras* (1994) 26 Cal.App.4th 944, 954), and implied malice may be proven by circumstantial evidence. (*People v. Klvana* (1992) 11 Cal.App.4th 1679, 1704.)

### ii. *Discussion*

Defendant argues an implied malice theory of aiding and abetting a homicide is no longer legally valid. Prior to *Reyes*, this court and four of our sister courts held that a defendant may *still* directly aid and abet an implied malice murder. (*People v. Werntz* (2023) 90 Cal.App.5th 1093, 1111–1113; *People v. Silva* (2023) 87 Cal.App.5th 632, 640; *Glukhoy*, *supra*, 77 Cal.App.5th at p. 591; *Langi*, *supra*, 73 Cal.App.5th at p. 978;

8.

*Powell*, *supra*, 63 Cal.App.5th at pp. 713–714.) Although it was unclear, prior to *Reyes*, whether our Supreme Court still sanctioned the theory of aiding and abetting implied malice murder (see *Glukhoy*, at p. 589, citing to *Gentile*, at p. 850), the high court in *Reyes* resolved this uncertainty when it stated that "[c]ase law has recognized and applied this theory, and we see no basis to abrogate it." (*Reyes*, *supra*,14 Cal.5th at p. 990, citing to *Gentile*, at p. 850.) Therefore, consistent with *Reyes*, we hold "an aider and abettor who does not expressly intend to aid a killing can *still* be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Reyes*, at p. 990, italics added.) Accordingly, we reject defendant's contention an aider and abettor to a homicide must act with express malice.

### B. CALCRIM No. 401 and Imputed Implied Malice

Defendant further contends that "even if *Powell* was correct in concluding that a defendant can be found guilty of a homicide as an aider and abettor under an implied malice theory – the particular aiding and abetting instruction given by the trial court in this case was erroneous for the reasons identified by *Powell* when it found an identical instruction erroneous." We agree with *Powell* the aiding and abetting instruction (CALCRIM No. 401) provided in this case was erroneous, and further conclude this error was prejudicial.

#### i. *Additional Factual Background*

As to aiding and abetting liability, the trial court instructed the jury with CALCRIM No. 400 as follows:

> "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.
>
> "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

9.

The trial court also instructed the jury with CALCRIM No. 401 as follows:

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime;

"2. The defendant knew that the perpetrator intended to commit the crime;

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if she knows of the perpetrator's unlawful purpose and she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make her an aider and abettor.

"A person who aids and abets a crime is not guilty of that crime if she withdraws before the crime is committed. To withdraw, a person must do two things:

"1. She must notify everyone else she knows is involved in the commission of the crime that she is no longer participating. The notification must be made early enough to prevent the commission of the crime.

"AND

10.

"2.      She must do everything reasonably within her power to prevent the crime from being committed.  She does not have to actually prevent the crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw.  If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."  (Italics omitted.)

The trial court then instructed the jury regarding the principles of homicide and informed the jury defendant was charged with both murder and the lesser included offense of voluntary manslaughter.  As to murder, the jury was instructed with CALCRIM No. 520 as follows:

"The defendant is charged in Count 1 with murder in violation of Penal Code section 187.  To prove that the defendant is guilty of this crime, the People must prove that:

"1.      The defendant committed an act that caused the death of another person

"AND

"2.      When the defendant acted, she had a state of mind called malice aforethought.

"There are two kinds of malice aforethought, express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.

"The defendant had express malice if she unlawfully intended to kill.

"The defendant had implied malice if:

"1.      She intentionally committed the act;

"2.      The natural and probable consequence of the act were dangerous to human life;

"3.      At the time she acted, she knew her act was dangerous to human life;

"AND

11.

"4.    She deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time.

"An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM 521." (Italics omitted.)

The jury was then instructed on the elements regarding first and second degree murder.  Lastly, the jury was instructed "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter."  Specifically, the jury was instructed with CALCRIM No. 570 regarding voluntary manslaughter as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1.    The defendant was provoked;

"2.    As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured her reasoning or judgment;

"AND

12.

"3.    The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as [the trial court] define[s] it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up her own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder."

### ii.    *Standard of Review*

"A claim of instructional error is reviewed de novo.  [Citation.]  An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.  [Citation.]  In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution.  [Citations.]  The challenged instruction is viewed 'in the context of the instructions as a whole and the trial

13.

record to determine whether there is a reasonable likelihood the jury misapplied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

As it relates to whether a flawed jury instruction is prejudicial, "[t]he *Watson*[16] standard of prejudice (i.e., the error is reversible when there is a reasonable probability defendant would have obtained a more favorable result in the absence of the error) applies to an instruction that misdirects the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions.  In contrast, the *Chapman* standard of review (i.e., error is harmless only when it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained) applies when an instruction improperly describes or omits an element of the offense." (*People v. Campbell* (2020) 51 Cal.App.5th 463, 493, fn. omitted.)

### iii.    *Applicable Law*

In *Powell*, codefendant Langlois argued the language of CALCRIM No. 401 "couches direct aiding and abetting liability in terms of the aider and abettor knowing the perpetrator intended to commit *the crime*, the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct, the aider and abettor in fact aided the perpetrator's commission of *the crime*." (*Powell*, *supra*, 63 Cal.App.5th at p. 714.)  Recognizing the term " 'the crime' " referred to murder, the court then held "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder," but rather, "relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Ibid*.)  The court concluded that because "the aiding and abetting instructions here [CALCRIM

---

**16**    *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

No. 401] were not tailored for implied malice murder, the instructions were erroneous" (*ibid*), but concluded the error was harmless beyond a reasonable doubt because "the prosecutor advanced two theories of liability as to Langlois:  (1) direct aiding and abetting express malice murder, and (2) indirect or extended liability for the natural and probable consequences of the assault Langlois aided and abetted.  The prosecutor did *not* advance an implied malice theory as to Langolis."  (*Id.* at pp. 708, 715, italics added.)

Further, in *Langi*, the court relied on *Powell* to conclude that "[i]f, as here, a trial court uses such an instruction without tailoring it to the specifics of that crime, the instruction [CALCRIM No. 401] creates an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice."[17]  (*Langi*, *supra*, 73 Cal.App.5th at p. 982.)

*Langi* focused on two instructions given to the jury:  CALJIC Nos. 3.01 (aiding and abetting) and 8.31 (second degree murder).  (*Langi*, *supra*, 73 Cal.App.5th at p. 981.) "CALJIC No. 8.31, as given to the jury, stated that a killing is a second degree murder if '1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶]  When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.' " (*Ibid.*)  Further, "CALJIC No. 3.01, as given to the jury, stated that 'A person aids and abets the commission … of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, … [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the crime.' " (*Ibid.*)

---

**17**    *Langi* was an appeal from a denial of a petition for resentencing pursuant to section 1172.6.  (*Langi*, *supra*, 73 Cal.App.5th at p. 975.)

The court reasoned these combined instructions permitted the jury to "find the defendant guilty of aiding and abetting second degree murder without finding that he [or she] personally acted with malice." (*Langi*, *supra*, 73 Cal.App.5th at p. 982.)  The court explained that "[t]he aiding-and-abetting instruction stated that a person aids and abets a crime if he or she acts '*with knowledge of the unlawful purpose of the perpetrator*, and … with the intent or purpose of committing or encouraging or facilitating the commission of the crime.'  (CALJIC No. 3.01, italics added.)  However, as noted above, the second degree-murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death.  Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim.  Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill.  If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent." (*Id.* at pp. 982–983.)

*Langi* concluded the aiding and abetting instructions should have explained an accomplice must have acted with the mental state of implied malice.  (*Langi*, *supra*, 73 Cal.App.5th at p. 983.)  "The standard aiding-and-abetting instruction given in *Powell*, a CALCRIM instruction [CALCRIM No. 401] in relevant substance to the CALJIC instruction used here [citation], was inadequate as applied to the crime of second degree murder because it did not clarify that an accomplice must personally harbor that mental state of implied malice.  [Citation.]  Similarly, nothing in the standard aiding-and-abetting instruction given here states that the accomplice himself must have acted with such knowledge and conscious disregard." (*Ibid.*)  Accordingly, the court remanded the case "[b]ecause the record of conviction d[id] not conclusively negate the possibility that the jury found [the defendant] guilty of second degree murder by imputing to him the

16.

implied malice of the actual killer, without finding that he personally acted 'with knowledge of the danger to, and with conscious disregard for, human life.' " (*Id*. at p. 984.)

### iv. *Discussion*

Here, as both parties acknowledge, defendant's homicide culpability was predicated on a direct aiding and abetting theory based on implied malice[18] and the aiding and abetting instruction (CALCRIM No. 401) given in this case "contained the language that *Powell* identified as problematic." Defendant argues "the trial court in the present case, just like the trial court in *Powell*, committed [prejudicial] instructional error by giving the standard version of CALCRIM No. 401," whereas the People respond that "given the implied malice instruction explicitly required the jury to find that [defendant] personally acted with conscious disregard for life, it is not reasonably probable that the jury would have found [defendant] guilty merely by finding that she aided a life-endangering act without any additional mental state, which was the concern of the courts in *Powell* and [*Langi*]." Similar to the instructions provided in *Powell* and *Langi*, the standard aiding and abetting instruction given here (CALCRIM No. 401) was not tailored to address direct aiding and abetting liability for voluntary manslaughter.[19] (*Powell*,

---

[18]    It is undisputed that Fabian stabbed Roman and Roman's death was the result of three stab wounds.

[19]    In response to *Powell* and *Langi*, the Judicial Council of California issued an invitation to comment regarding a new proposed instruction (CALCRIM No. 526) that would address the concerns outlined in these two opinions. (Jud. Council of Cal., Criminal Jury Instructions: Revisions and Additions, Invitation to Comment, Comments submitted by June 30, 2023, pp. 50-54.) Proposed instruction CALCRIM No. 526 states, in relevant part, the following:

   "526. Implied Malice Murder: Aiding and Abetting

   "To prove that the defendant is guilty of aiding and abetting murder by acting with implied malice, the People must prove that:

17.

*supra*, 63 Cal.App.5th at p. 715; *Langi*, *supra*, 73 Cal.App.5th at p. 982 ["As explained in [*Powell*], the standard aiding-and-abetting instructions are ill suited to the crime of

---

"1.    The perpetrator committed [an] act[s] that (was/were) dangerous to human life;

"2.    The perpetrator's act[s] caused the death of (another person/ [or] a fetus);

"3.    The defendant knew that the perpetrator intended to commit the act[s] that (was/were) dangerous to human life;

"4.    Before or during the commission of the act[s], the defendant intended to aid and abet the perpetrator in committing the act[s];

"5.    Before or during the commission of the act[s], the defendant knew the perpetrator's act[s] (was/were) dangerous to human life, and the defendant deliberately acted with conscious disregard for human life;

"AND

"6.    By words or conduct, the defendant did in fact aid and abet the perpetrator's commission of the act[s].

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.  [¶] … [¶]

"[An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.]"  (Criminal Jury Instructions: Revisions and Additions, at pp. 50-51, italics in original.)

18.

second degree murder," and if "a trial court uses such an instruction without tailoring it to the specifics of that crime, the instruction creates an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice"].)  The instruction should have explained to the jury that to be guilty as a direct aider and abettor of voluntary manslaughter, defendant as an aider and abettor must have acted with the mental state of either an intent to kill or a conscious disregard for human life, "i.e., the mental state ordinarily sufficient to constitute malice aforethought." (*Bryant*, *supra*, 56 Cal.4th at p. 970.)  Therefore, because we conclude the jury was not properly instructed regarding the necessary mental state for defendant's voluntary manslaughter conviction, we evaluate the prejudice of this error under *Chapman* review.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 7–8 (*Aledamat*) [holding that legal errors require a more stringent standard for prejudice, whereas factual errors are less likely to be prejudicial].)

### v.    *Prejudice*[20]

Under *Chapman* review, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, 8 Cal.5th at p. 3.)  The People must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.)  " 'To say that an error did not contribute to the ensuing verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Neal* (2003) 31 Cal.4th 63,

---

**20**    As it relates to prejudice, we discuss defendant's further contention "the trial court's answer [to the jury question], telling the jurors it was up to them to decide what the defendant intended to aid and abet, effectively instructed the jury that the prosecution could satisfy the requirement of sentence number 2 in CALCRIM No. 401 by proving that [the defendant] knew that the perpetrator, [Fabian], intended to commit the crime of *assault* on [Roman,]" which we conclude was improper.

86.)  In other words, the *Chapman* harmless error inquiry asks:  " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' "  (*People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*), quoting *Neder v. United States* (1999) 527 U.S. 1, 18.)  Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' "  (*Geier*, at p. 608.)

Here, we are unable to " 'confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' "  (*Geier*, *supra*, 41 Cal.4th at p. 608.)  As noted above, "[t]he mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life."  (*Powell*, *supra*, 63 Cal.App.5th at p. 713; accord, *Langi*, *supra*, 73 Cal.App.5th at p. 983.)  In this case, the *act* of stabbing is the voluntary manslaughter.  Further, as we discuss in detail below regarding intent, there is a reasonable possibility the jury found defendant guilty without making a finding of intent because evidence of an intent to kill or a conscious disregard for human life in aiding and abetting the stabbing (i.e., voluntary manslaughter) is lacking.  (See *In re Lopez* (2023) 14 Cal.5th 562, 589 ["The proper analysis under *Aledamat*[, *supra*, 8 Cal.5th 1] does not rest on ' "the likelihood that the jurors would have applied the erroneous instruction," ' but whether the jury *could* have found what it did find without also making the findings necessary for a valid theory."], italics added.)

In this case, the aiding and abetting instruction did not negate the possibility the jury found her guilty of voluntary manslaughter without finding she personally possessed either an intent to kill or conscious disregard for human life.  (*Bryant*, *supra*, 56 Cal.4th at p. 970.)  The evidence establishes defendant did not like Roman and "wanted to hurt

20.

[Roman]" after observing him abuse Angela. Thereafter, defendant drove up in her car, hit Roman, Fabian, and Caesar with the car, and proceeded to involve herself in the altercation by pushing and choking Roman, along with hitting him two times. During the altercation, defendant "egg[ed] on the fight" and told Fabian, " 'If that's all you have? That's all? He doesn't deserve to be here.' " Although the jury found defendant guilty of assault with a deadly weapon by using her car, and this *could* have been some evidence she herself harbored either an intent to kill or conscious disregard for human life against Roman (see generally *People v. Cook* (1940) 15 Cal.2d 507, 518 [" '[t]he wil[l]ful use of a deadly weapon without excuse or provocation, in such a manner as to imperil life, generally indicates a felonious intent' "]), the prosecutor did not focus defendant's homicide culpability on this specific act, but rather focused on the act of her aiding and abetting Fabian in the stabbing of Roman.[21] (*People v. Napoles* (2002) 104 Cal.App.4th 108, 114 [" 'either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act' "], italics omitted.) Specifically, the prosecutor argued during his closing argument:

> "[Defendant] was upset. What she claims to have seen at Angela's house, which given her testimony now is even more muddled about what she actually saw and perceived, but she wanted Roman attacked. And she made that clear when she was out at the scene while he's being attacked.
>
> "So you have this group attack, this group assault going on and that's dangerous to him, right? You know that that's dangerous when you're out there doing that, someone is getting stabbed, someone is getting beat on. And she didn't care. 'That's all you're going to do to him? He doesn't deserve to be here.' She wanted more happening to him than what she was even seeing. That's what—that's what's important about that."

---

[21] In his closing argument, the prosecutor only referred to defendant hitting Roman with her car as evidence to negate her "necessity" defense and as the basis for the assault with a deadly weapon charge (count 2).

21.

As it specifically related to aiding and abetting, the prosecutor argued:

> "Now, you may be saying, we just went over these, there's an act, expressed intent to kill. How is [defendant] going to be responsible if we know that Fabian was the killer…. [¶] Now, aiding and abetting. So to prove that a defendant, I know you can all read it, but I'll read along with you, there's no red at this time. So to prove that a defendant is guilty of a crime based on aiding and abetting, I have to prove that the direct perpetrator, right? Committed that crime. We watched Fabian, you could see the shiny pointy object in his hand and we know that Roman died from stab wounds. The defendant, meaning Ms. Raygoza in this case, knew the perpetrator intended to commit the crime. Before or during the commission of the crime, she intended to aid and abet the perpetrator in committing the crime. And the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] … [¶]

> "And your instructions tell you, someone aids and abets a crime if they know of the unlawful purpose and specifically intend to and do aid, facilitate, promote, encourage or instigate that act. Right? So you're helping in some way. Maybe you've knocked them down after you hit them, maybe you're out there and you throw some punches, maybe try to strangle someone while this is going on, maybe you're out there saying, 'Get him, get him, he doesn't deserve to be here. Is that all you're going to do to him?' Wanting more done. Pushing it, egging it on. We see those, right? You see those elements, they're clear. Promoting. Encouraging. Instigating.

> "Now aiding and abetting right? I've said, it's really about intent. And express mali[ce], first degree murder, you have to have a specific intent to kill and the aider and abettor has to share that intent.

> "Implied mali[ce]. It's the intent to aid the acts, right? Because that's what we're talking about. That manifestation, that express mali[ce], is there for first degree murder. So implied mali[ce] is second degree murder. So the reckless and [in]difference to someone's life. That's doing the acts that are dangerous and knowing that you're doing that, knowing you're participating that and you just don't care, you just don't give a damn about that person or what happens to them. Like maybe leaving Roman out there to die in the street with minutes to plead for his own life."

The prosecutor continued:

> "So, [defendant] is charged with murder. She's an aider and abettor in Roman Gomez's murder. She's charged with assault with a deadly

weapon. And each time we've seen that video I've been talking about that in terms of murder and what's happened. Well, let's watch it one more time, because it's not only evidence of intent, it's not only evidence of the actions that happened—it's going to start up in a second—but it's also itself a separate crime and a separate action, right? Because she put hands on Roman at the house beforehand, she got out of the car, continued her assault."

Finally, during the prosecutor's rebuttal, he stated the following:

"They're also wanting you to blame everybody else and say she's completely innocent. The problem with that is, yes, Fabian did the stabbing, right? I'm not saying any different. I'm saying she's encouraging, promoting and instigating that action. That's the aiding and abetting aspect of this and that she admitted[] to the officers once she's caught and once she's stuck at the end of her interview says, 'Yeah, I put hands on him.' Right? That's at the end and she admits, 'Yeah, I was texting my friend and I said I strangled him,' and she seemed—you know, that seemed like a great text to send. Is everything okay? I strangled him. Just like she's talking to Angela afterwards laughing. 'We'll see if he can even get up because I hit him with the car.' Those things tend to fit and that's what we're talking about."

Because defendant's culpability rested on her aiding and abetting Fabian in the stabbing (*People v. Napoles*, *supra*, 104 Cal.App.4th at p. 114), we must determine what evidence exists to support a conclusion she possessed either an intent to kill or conscious disregard for human life. We again find *Reyes* instructive. Our Supreme Court concluded the "[trial] court committed reversible error by misunderstanding the legal requirements of direct aiding and abetting implied malice murder." (*Reyes*, *supra*, 14 Cal.5th at p. 992.) The trial court found that " 'the defendant, along with several other gang members, one of which [was] armed, traveled to rival gang territory' and then considered whether that act was done with the mental state required for implied malice." (*Id*. at p. 991.) The court concluded that because "implied malice murder requires attention to the aider and abettor's mental state concerning the life endangering act committed by the direct perpetrator, such as shooting at the victim[,] … the trial court should have asked whether [the defendant] knew that [the perpetrator] intended to shoot

23.

at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Id*. at p. 992.)

Similarly, here, any evidence of an intent to kill or conscious disregard for human life in aiding and abetting in the *act* of stabbing Roman is lacking. (*Powell*, *supra*, 63 Cal.App.5th at p. 713, fn. 27 ["The relevant act is the act that proximately causes death."].) The prosecutor repeatedly argued defendant was aware Fabian had a knife and had used the knife to stab Roman, but other than defendant physically being present at the altercation, there is no evidence she was aware Fabian possessed a knife or knew Fabian planned to stab Roman. Rather, the evidence establishes the only people aware of the knife were Aaliyah and Angela, and although the prosecutor argued defendant could see Fabian based on the vehicle's headlights being turned on, the crime still occurred late at night after 1:00 a.m. The surveillance footage corroborates this inability to see because all that is observed is a "shiny object" in Fabian's hand, making it unlikely defendant personally observed the knife and was aware Fabian was going to stab Roman.

Second, and most importantly, the jury's question during its deliberations regarding the aiding and abetting instruction (CALCRIM No. 401) suggested it was contemplating guilt without making a finding defendant possessed the requisite intent for voluntary manslaughter. (See *People v. Canizales* (2019) 7 Cal.5th 591, 617 [when evaluating prejudice, "[t]he jury's questions during deliberations are also instructive"].) Specifically, the jury asked the trial court:

> "Can you clarify if the question on page 40 (401 Aiding and [Ab]etting: Unintended Crimes) question 2 'the defendant knew that the perp[etrator] intended to commit the crime?' Is it *knowing* perp[etrator] was going *to murder or assault* the victim?" (Italics added.)

The trial court responded, "It is up to you to decide what the defendant intended to aid and abet based on all evidence in the trial on that issue."

We find *In re Martinez* (2017) 3 Cal.5th 1216 (*Martinez*) instructive. In *Martinez*, our Supreme Court found the jury's question highly relevant in evaluating prejudice.[22] (*Id*. at p. 1227.) "The jury sent the court a note that said: 'Clarification request on description of #401 Aiding and Abetting: [¶] Point #2 says: "The defendant knew that the perpetrator intended to commit the crime," [¶] What is meant by "the crime"? Did aider and abett[or] have to know or even expect the possibility that it will be murder (for count #1)? Or does it mean any crime?' The court replied, 'This is what the jury has to decide. Refer to instructions 400, 401 and 403, read together.' The court added, ' "[A]ny crime" means any crime the defendants are on trial for.' " (*Ibid*.) The *Martinez* court concluded, "the Attorney General ha[d] not shown beyond a reasonable doubt that the jury relied on a legally valid theory in convicting [the defendant] of first degree murder" because:

> "The jury's query and the trial court's response, with its reference to the natural and probable consequences instruction (CALCRIM No. 403), suggest that some of the jurors' ambivalence about convicting [the defendant] on a direct aiding and abetting theory may have been resolved by relying on the theory that the murder was a natural and probable consequence of the assaults committed by [the defendant] and his codefendant." (*Martinez, supra*, 3 Cal.5th at p. 1227.)

Similarly, here, the question suggests the jury believed it could convict defendant of voluntary manslaughter, even if it concluded the perpetrator (Fabian) only intended to assault Roman. This conclusion is supported by the fact the trial court responded that "[i]t is up to you to decide *what the defendant intended to aid and abet* based on all evidence in the trial on that issue" (italics added), which could have been reasonably interpreted by the jury as an instruction that defendant's aiding and abetting culpability

---

[22] The *Martinez* court dealt with an alleged error pursuant to *People v. Chiu* (2014) 59 Cal.4th 155, wherein it concluded the defendant was prejudiced because the jury may have improperly relied "on the theory that the murder was a natural and probable consequence of the assaults committed by [the defendant] and his codefendant." (*Martinez, supra*, 3 Cal.5th at p. 1227.)

for voluntary manslaughter could have been based *either* on an intent to kill and/or a conscious disregard for human life *or* an intent to commit an assault. Although the jury could have concluded defendant was aware Fabian had the intent to kill and, thus, aided and abetted in Roman's murder, the jury's question makes it just as likely the jury concluded that defendant was only aware Fabian intended to assault Roman and, thus, aimed only to aid in an assault. Therefore, a reasonable possibility exists the jury found defendant guilty of voluntary manslaughter without finding she possessed the requisite intent of either an intent to kill or conscious disregard for human life. (*People v. Lewis* (2006) 139 Cal.App.4th 874, 887 ["The [*Chapman*] test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but whether there is any reasonable possibility that the error might have contributed to the conviction in this case. If such a possibility exists, reversal is required."].)

Nonetheless, the People contend that "given the implied malice instruction explicitly required the jury to find that [defendant] personally acted with conscious disregard for life, it is not reasonably probable that the jury would have found [defendant] guilty merely by finding that she aided a life-endangering act without any additional mental state, which was the concern of the courts in *Powell* and [ ] *Langi*." The People argue that even assuming the instructions "suffer from the same ambiguity as the instructions in *Powell* and *Langi*, it is not reasonably likely that the jury interpreted the instructions to allow it to convict [defendant] under a prohibited theory of imputed malice" because the "only charged 'crime' was murder" and, thus, "there could have been no possible confusion that the perpetrator's 'unlawful purpose' meant something less than the mens rea required for murder," *and* CALCRIM No. 520 required the jury to find "that each defendant must harbor the required intent or mental state set forth in the instruction for the crime of murder." We disagree.

Although we presume the jury understood the instructions and properly followed the law, this presumption can be rebutted. (*People v. Merriman* (2014) 60 Cal.4th 1, 48–49 ["Absent some showing to the contrary, we presume the jury followed the court's instructions."].) The People argue defendant was not prejudiced by this instructional error because she was only charged with murder and the CALCRIM No. 520 instruction required the jury to find defendant harbored malice. However, to survive *Chapman* review, we must " 'find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Neal*, *supra*, 31 Cal.4th at p. 86.) Although clarifying instructions were provided to the jury and murder was the only charged offense as to this specific act, the record is clear the jury struggled with intent and believed it could convict defendant of voluntary manslaughter, even if it concluded she only intended to aid and abet Fabian in an assault. Accordingly, because the jury was provided a flawed instruction (CALCRIM No. 401), as it related to implied malice, and its inquiry established a *possibility* it convicted defendant of voluntary manslaughter without ever finding she possessed either an intent to kill or conscious disregard for human life, the People are unable to show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24.)

On remand, the People may elect to retry defendant on that charge, although with a properly instructed jury. (*People v. Hallock* (1989) 208 Cal.App.3d 595, 607 ["[i]f reversal is predicated on instructional error, … double jeopardy principles do not come into play"]; see *Burks v. United States* (1978) 437 U.S. 1, 14–15 [reversal for trial error, as distinguished from evidentiary insufficiency, does not trigger double jeopardy concerns]; accord, *Tibbs v. Florida* (1982) 457 U.S. 31, 39–41.)

## DISPOSITION

Defendant's conviction for voluntary manslaughter in count 1 is reversed, and the sentence on that count is vacated. The People may elect to retry defendant on that

charge.  The sentence is also vacated as to count 2, and the matter remanded for a full resentencing consistent with this opinion.  Following resentencing, the trial court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                                                DE SANTOS, J.
I CONCUR:


SNAUFFER, J.

POOCHIGIAN, Acting P. J., Dissenting.

I respectfully dissent from the majority's conclusion that the trial court's instructions did not require the jury to find defendant acted with, at least, conscious disregard for human life.

The instructions required that, in order to have committed an unlawful killing with implied malice, the actual perpetrator must have acted with conscious disregard for human life. Then, to determine whether defendant was liable for that killing as an aider and abettor, the jury instructions required that she have "specifically intend[ed]" to aid the perpetrator's crime.

By requiring that defendant have specifically intended to aid the crime of killing with conscious disregard for human life, the instructions thereby required a finding defendant herself acted with conscious disregard for human life. One cannot specifically intend to aid and abet a person's crime of killing with conscious disregard for human life without themselves also acting with conscious disregard for human life. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1123 ["Absent some circumstance negating malice one cannot knowingly and intentionally help another commit an unlawful killing without acting with malice"].)

In arriving at a contrary conclusion, the majority cites *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*) and *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*). However, neither is persuasive.

*Powell* reasoned:

> "[Defendant] points out the language of the standard aiding and abetting instruction given here, CALCRIM No. 401. He emphasizes that this instruction couches direct aiding and abetting liability in terms of the aider and abettor knowing the perpetrator intended to commit *the crime*, the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct, the aider and abettor in fact aided the perpetrator's commission of *the crime*. As relevant here, 'the crime' would be murder. But as we have discussed, the aider and abettor of implied

malice murder need not intend the commission of *the crime* of murder. Rather, relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Powell*, *supra*, 63 Cal.App.5th at p. 714.)

This is not persuasive, as it relies on an illusory distinction. Specifically, that there is a substantive difference between what the instructions said – i.e., aiding and intending the commission of the crime of implied malice murder – versus what the law actually requires – i.e., intending "the commission of the perpetrator's act, the natural and probable consequences of which are dangerous to human life [and] intentionally aid[ing] in the commission of that *act* and do so with conscious disregard for human life." (*Powell*, *supra*, 63 Cal.App.5th at p. 714.) However, there is no meaningful distinction between those two concepts. Aiding and intending the commission of implied malice murder *means* intending for the perpetrator to commit the dangerous act, aiding in the commission of the act, and doing so with conscious disregard for human life.

*Langi* is even less persuasive. There, the court faulted the instruction for requiring the aider and abettor to have acted " '*with knowledge of the unlawful purpose of the perpetrator*,' " whereas the law does not require "knowledge that the perpetrator aimed to kill." (*Langi*, *supra*, 73 Cal.App.5th at p. 982.) But "unlawful purpose" in the context of *implied* malice is not "aim[ing] to kill" but rather acting with "conscious disregard for human life." Thus, requiring the aider and abettor to act with knowledge of the perpetrator's "unlawful purpose" in no way conflicts with the law.

*Langi* goes on to reason that while the second degree murder instruction required the perpetrator to have acted with conscious disregard for human life, the aider and abettor instruction does not include the same requirement. Not so, as it is conveyed by the instruction's requirement that the defendant have the intent or purpose of aiding the

2.

commission of the perpetrator's crime[1] – which in this context would be a conscious-disregard-for-human-life killing. One cannot specifically intend to aid a conscious-disregard-for-human-life killing without also consciously disregarding human life themself. The instructions simply do not permit the jury to convict a defendant as an aider and abettor without the minimally required mental state.[2]

A helpful exercise to illustrate this point would be to imagine that a hypothetical jury concluded the defendant did *not* harbor a conscious disregard for human life and see if the instructions would nonetheless permit them to convict that defendant as an aider and abettor. Under the instructions given in this case, the answer is no. The impassable roadblock would come when the jury got to the instructions' requirement that the defendant have "specifically intend[ed] to … aid … the perpetrator's" crime of killing someone with a conscious disregard for human life. (CALCRIM No. 401.) They would have to conclude this requirement was unsatisfied and acquit. This demonstrates the instructions adequately ensured defendant could not be convicted without the jury finding he harbored the requisite mental state.

For these reasons, I would affirm and respectfully dissent.


POOCHIGIAN, Acting P. J.

---

[1] Similar to the instruction in *Langi*, the instructions in the present case required that defendant knew the perpetrator's unlawful purpose and "specifically intend[ed] to … aid … the perpetrator's commission of that crime."

[2] This is not to say the instructions are as clear as theoretically possible. Proposed instruction CALCRIM No. 526 (Jud. Council of Cal., Criminal Jury Instructions: Revisions and Additions, Invitation to Comment, Comments submitted by June 30, 2023, pp. 50–54) is likely to be an improvement over the existing instructions. But the question before us is not whether an instruction could be improved in terms of clarity, but instead whether it accurately conveyed the law. (See *People v. Wardwell* (1959) 167 Cal.App.2d 560, 565–566 [just because instruction is not a "model of clarity" does not mean jury was misled by it.]; accord *Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 676.) Even assuming there was room for improvement in terms of clarity, the instructions given in this case were sufficient to convey the required mental state.

3.